**In the Interest of T.D.C., A Child; T.C., Natural Mother, Appellant.**

No. 68400.

Supreme Court of Iowa.

July 20, 1983.

Rehearing Denied Aug. 10, 1983.

Patricia R. Lapointe, Mason City, for appellant.

Thomas J. Miller, Atty. Gen., and Brent D. Hege, Asst. Atty. Gen., for State of Ia.—appellee.

Julia Keifer, Mason City, for minor child —appellee.

Considered by REYNOLDSON, C.J., and McCORMICK, SCHULTZ, CARTER, and WOLLE, JJ.

SCHULTZ, Justice.

The natural mother appeals from a decree that terminated the parent-child relationship between her and T.D.C., her five-year-old daughter. We transferred this appeal to the court of appeals. The court of appeals, with two judges dissenting, reversed and remanded with instructions that the trial court issue appropriate orders for custody of the child to be returned to the mother under the supervision and with the assistance of the Department of Social Services. We granted the application for further review filed by the State and the guardian ad litem for the child. We vacate the decision of the court of appeals and affirm the judgment of the trial court.

The termination proceedings were held in late February 1982 and a decree terminating the mother's parental relationship was entered on March 17, 1982. The decree does not involve the putative father, who was never married to the mother, was never adjudged to be the father, and has never assumed a parental role.

When the petition was filed on January 28, 1982, the State alleged that T.D.C. had been adjudicated by an order of the court dated January 16, 1978, to be a child in need of assistance and had been placed in foster care continuously since the date of adjudication. It further alleged that the child cannot be returned to the home of her mother as she has consistently failed to provide a safe, stable, and nurturing environment for the child. The State contended that it would be in the best interest of the child to have the parental right terminated.

Although the pleadings and judgment are not completely specific, the parties agree that this termination proceeding was conducted pursuant to Iowa Code section 232.-116(5) which permits termination when the court finds:

a. The child has been adjudicated a child in need of assistance pursuant to section 232.96; and

b. The custody of the child has been transferred from his or her parents for placement pursuant to section 232.102 for at least twelve months; and

c. There is clear and convincing evidence that the child cannot be returned to the custody of his or her parents as provided in section 232.102.

Section 232.116(5)(c) requires reference to section 232.102, which provides in part:

The duration of any placement made after an order pursuant to this section shall be for an initial period of six months. At the expiration of that period, the court shall hold a hearing and review the placement in order to determine whether the child should be returned home, an extension of the placement should be made, or a termination of the

parent-child relationship proceeding should be instituted. The placement should be terminated and the child returned to his or her home if the court finds by a preponderance of the evidence that the child will not suffer harm in the manner specified in section 232.2, subsection 5.

Iowa Code § 232.102(6) (1981).

Reference must be made also to section 232.2(5) to determine when a termination proceeding should be instituted. This section defines a "child in need of assistance," and we find the following portions to be pertinent:

> *"Child in need of assistance"* means an unmarried child:
>
> . . . .
>
> b. Whose parent . . . neglected the child, or is imminently likely to . . . neglect the child.
>
> c. Who has suffered or is imminently likely to suffer harmful effects as a result of:
>
> . . . .
>
> (2) The failure of the child's parent . . . to exercise a reasonable degree of care in supervising the child.
>
> . . . .
>
> g. Whose parent . . . fails to exercise a minimal degree of care in supplying the child with adequate food, clothing or shelter and refuses other means made available to provide such essentials.

■ We have imposed a limitation on the language concerning burden of proof contained in section 232.102. In a termination proceeding we require that the issue of whether a child will suffer harm by a return to the parent be shown by the clear and convincing evidence standard that section 232.116(5)(c) (1981) requires. *In the Interest of Chad,* 318 N.W.2d 213, 219 (Iowa 1982).

■ The central issue is always the best interest of the child; however, the right of a natural parent in the care, custody, and management of the child allows a rebuttable presumption that the best interest of the child is served by giving custody to the

natural parent. *Chad,* 318 N.W.2d at 218. These principles, with often conflicting and competing rights, are carefully woven into chapter 232 and are first expressed in section 232.1, as follows:

> This chapter shall be liberally construed to the end that each child under the jurisdiction of the court shall receive, preferably in his or her own home, the care, guidance and control that will best serve the child's welfare and the best interest of the state.

Iowa Code § 232.1 (1981).

The trial court recognized this clear and convincing evidence standard in its conclusions of law. It then found that for it to remove the child from the security and custody of the custodian and place her with the mother would "in the opinion of this court, not be for the best interest of T.D.C. as it would create severe harm to her by virtue of the erratic movements of the mother, her unpredictable conduct and her apparent lack of understanding and ability to care for a child."

■ On appeal the mother presents the sole issue of whether there is clear and convincing evidence to justify termination of parental rights.

Principles of appellate review are well known. We recently stated:

> Several previously enunciated principles have served to guide our examination of the record before us. Appellate review of the proceedings to terminate a parent-child relationship is de novo; thus "it is our duty to review the facts as well as the law and adjudicate rights anew on those propositions properly preserved and presented to us." We accord weight to the fact findings of the juvenile court, especially when considering the credibility of the witnesses whom the court heard and observed firsthand, but we are not bound by those findings.
>
> Central to a determination of this nature are the best interests of the child. In this connection we look to the child's long range as well as immediate interest. Hence, we necessarily consider what the

future likely holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care that parent is capable of providing.

*In the Interest of Dameron,* 306 N.W.2d 743, 745 (Iowa 1981) (citations omitted).

Under our de novo review we examine the record and initially note some of the mother's problems that existed before she gave birth to T.D.C. We find these problems relevant in our examination of the mother's innate ability to supply the necessary care for the child. In 1975 the mother, then a juvenile, and her family experienced difficulties and the social services assisted in placing her in a group home in another state. Shortly thereafter she was placed in a relative's home in Iowa. This did not work out, however, and she was moved to a group home in Iowa. She ran away, was apprehended, and was returned to this group home. When she became eighteen she dropped out of the group home and decided not to complete the program or her high school education despite the recommendations of the social services and its offer to provide funds for the completion of the program and her high school degree. While the trial court indicated it would not consider her juvenile record, the mother admitted she had been charged with shoplifting as a juvenile.

The record provides us with early clues concerning her personality and stability and foreshadows the difficulties she has experienced. Under the auspices of social services and prior to her entry in the program, she was psychologically evaluated on a referral from a physician. The results of the personality test as shown on the written report from the psychologist showed the mother

to be a quite evasive, defensive individual who no doubt has extreme difficulty at times in being able to distinguish what she wants from what the facts are. In other words, she could tell untruths very quickly, be passively resistant and to be very sensitive to anything that could be construed as a demand upon her. She demands sympathy from others but resents authoritive figures and typically has impulses to resist them. She is likely to project, to be argumentative, to rationalize heavy, to be irritable and to be resentful. She is basically rather narcissistic and is pretty self-indulgent.

... This young lady is likely to need a great deal of structure and control if she is to stay out of trouble. She is at this time feeling the type of personality pattern that is very heavily associated with unmarried pregnancy....

After she left the group home she lived briefly with her father and then with her mother. She soon became pregnant and in September 1976, when she was eighteen, T.D.C. was born. She subsequently moved to her own apartment.

The mother admitted that when T.D.C. was an infant she used various kinds of drugs on several occasions and that she had had a drug problem. In February 1977 Clear Lake police received a complaint that T.D.C. was a victim of child abuse. The mother admitted T.D.C. was bruised, but she claimed the bruise resulted accidently when she tried to slap a big puppy dog that was near T.D.C. and instead hit T.D.C. No child abuse was shown. The social services were at this time concerned about the mother's parenting skills and offered her its help with budgeting, health care, and nutrition. The mother was not receptive and the social services lost contact with her.

The maternal grandmother died in March. Thereafter, the mother lived periodically with her father in a trailer. The record is rather sketchy during this period and it appears the mother and child also lived in Clear Lake for some time. She did not receive financial assistance from social services during this period.

The social services became involved again on December 26, 1977, when they received a telephone call from the mother's sister concerning the alleged illness and need of medical services for T.D.C. and the lack of groceries in the home. The social workers went to the home and found a need of

assistance. At that point the mother did not have furniture or beds at the house. The mother and T.D.C. were sleeping on the floor, but they did have adequate blankets. Before the social services could make further provision for the mother and child, the police arrested the mother on charges from two counties and she was jailed.

At this point the mother lost and has never regained custody of T.D.C. Before she was jailed the mother voluntarily placed T.D.C. with social services for placement in a foster home. The mother explained that she had a falling out with her sister, her father had drinking problems, and she thus preferred the foster home for T.D.C.

T.D.C. was not in good physical condition at this time. A medical examination showed that the child had an ear infection and needed an iron supplement and medications. Several weeks later when the child was moved to a second foster home, where she resided until the time of the trial, she was still under medication for the ear infection and the anemic condition. She also did not respond when her name was called. Initially, her foster parents thought she had hearing problems, but after testing they learned she simply did not respond to words.

The mother was jailed for charges arising out of bad checks but was finally bonded out by her father and released. She later pleaded guilty to the charges of falsifying a financial instrument, but received probation under the condition that she would make restitution.

As the mother lacked transportation in 1978, she was helped by social services to visit her daughter. For the most part the visits were without incident. The mother also underwent treatment in the Mental Health Institute at Cherokee and the Chemical Dependency Services at Mason City for treatment for her drug problems. The mother admitted to the use of various drugs during the time while T.D.C. was in foster care. The mother was employed two times for short periods; however, at the end of the year the social worker was uncertain as to where she was living.

On January 22, 1979, the mother's probation was revoked and she was incarcerated at the Women's Reformatory at Rockwell City. She received a furlough to attend her father's funeral and another to visit T.D.C. The social workers also took the child to Rockwell City for visitation.

From August 29, 1979, until December 31 the mother was released to a halfway house in Ames. She was returned to the reformatory, however, on a rule violation. The mother claims that she was cleared of this violation and was returned to the halfway house on February 11, 1980. She was returned to the reformatory on April 7 because of another rule violation, however. She remained in the institution until March 19, 1981, when she was released on a six-month work release to a Cedar Rapids halfway house. She was not given an extension of work release because of her seven disciplinary reports and she was returned to the institution on September 23 where she remained until a week before the termination hearing in February 1982.

The mother downgraded the accuracy and nature of the violations that caused her last return to the institution; however, one violation related to drug paraphernalia and the last one concerned her attempt to dispose of a letter to the director of the facility. The contents of that letter concerned a debt of approximately $1200 she allegedly owed to a male individual. Included in this amount was $632 for clothes and various other personal expenses. This debt was incurred while she was on work release and the letter indicated that she made no good faith effort to repay it.

On the last work release she had an unsatisfactory work record with her first employer and was fired by her second employer. The third employer, a security company, gave her a glowing report on her work as a watchman for private businesses. Her supervisor admitted it was unusual to allow parolees to work for a security company, but he indicated she passed a screening test using audio stress analysis. He held her job open when she was returned to the reformatory and had plans to use her as an opera-

tional manager. His testimony is in stark contrast to all the other evidence in this case. At the time of the hearing for termination, the mother was living with this unmarried male supervisor and his unmarried girlfriend, a student, in Iowa City.

The mother exhibits an inability to manage her personal finances which had not improved at the time of the hearing. She was without adequate funds at the time of her arrest. She was unable to make restitution, although her child was in a foster home at no expense to her. Both of her parents died during the period in question, and she inherited $28,000 from her father in 1979. At the termination hearing all that remained of her inheritance was a van that she valued at $6,000. None of the inheritance was preserved to care for T.D.C. or to provide a home for her. Indeed, the mother had additional financial problems while on work release. She incurred other substantial debts and upon her release from the reformatory was in no financial position to finance a home for her child.

The mother has a history of being unable to maintain close family ties. We have outlined her earlier problems with her parents and sister. During the time of foster care for her daughter, the mother prevented the child from receiving phone calls and maintaining a relationship with the maternal great-grandmother. Her explanation that the grandparents had to go through her to write letters or send gifts so that she would know what kind of contact they were having with the child exemplifies this poor family relationship and demonstrates poor judgment.

There is little doubt of the mother's love and interest in the child. To her credit she visited the child thirty to forty times during the child's placement in foster homes and also made numerous phone calls to the child. She has made an effort to make and purchase dolls. She has been considerate of the foster parents.

On the other hand, the mother's early care of T.D.C. and her subsequent contacts with the child apparently caused T.D.C. severe emotional disturbances. T.D.C. was seen by a private psychiatrist in Mason City from October 1980 until June 1981. Finally, in June 1981 the psychiatrist recommended that T.D.C. be hospitalized for complete mental evaluation and testing. After a stay of approximately two weeks T.D.C. was diagnosed as experiencing severe situational disturbance which the doctor attributed to the inconsistent relationship between mother and daughter. Testing showed T.D.C. to have very uneven intellectual and social development, and very hostile and aggressive feelings, with some of that hostility specifically directed at females. The psychiatrist testified that T.D.C. felt abandoned and unprotected and felt threatened by women. He recommended a secure, consistent, steady home environment on a permanent basis.

The male foster parent testified about the results of the visits by the mother. He indicated that following the mother's visits T.D.C. had recurring nightmares, hid in closets, wet the bed, became aggressive, exhausted, and slept for long periods. These problems led to the mental health evaluation and treatment.

The mother's visits were not as often as they reasonably should have been. The social services desired bi-monthly visits and this was incorporated into a contract which the mother signed on July 30, 1981. At that time the mother was on work release. The mother visited the child the next day and visited the child on only one or two occasions after this prior to the hearing. The mother blamed a three-week lockdown at the halfway house and the work schedule at her new job; however, from our reading of the record it appears the mother's excuses are feeble. She did not request transportation or aid in making the visits to the extent that was possible.

The social worker testified that it is the goal of the social services to return the child to the parent. The two workers outlined the efforts and frustrations over the four-year period. Both social workers recommended that the child-parent relationship be terminated.

The mother testified that at the time of the hearing she worked for a security company earning $3.85 per hour. She indicated that it would be three or four months before she would be ready to have her daughter resume living with her. She had not devised a good plan for raising the child; it is likely that her recent release on parole contributed to her lack of plans.

The trial court in answer to the argument that there was no clear and convincing evidence that T.D.C. would be physically abused or cannot be protected from some harm if returned to the mother, stated:

The court concludes otherwise. The stress this child has been forced to endure is abundantly borne out of the facts in this case. For this court to remove T.D.C. from the security and custody of (the foster parent) and place her with (the mother) would, in the opinion of this court, not be for the best interest of T.D.C. as it would create severe harm to her by virtue of the erratic movements of the mother, her unpredictable conduct and her apparent lack of understanding and ability to care for a child. The best interest of the child requires termination of the mother-child relationship.

We agree with the trial court. Our de novo review causes us to find that there is clear and convincing evidence that T.D.C. cannot be returned to this parent. The evidence presented from the psychiatrist, the psychologist, and the social workers convince us that T.D.C. will suffer harm if returned to her mother. This mother is unable to supply the material things in life, but more importantly she cannot provide the stability that this child requires. This mother did not properly care for T.D.C. when she had custody of her. She was given opportunity after opportunity by the social workers to establish and maintain a relationship with her child. She was given the opportunity of probation but caused it to be suspended. She has been in halfway houses three times and returned to the reformatory on each occasion. While none of her offenses or violations were of a serious nature, they show a total lack of responsibility. This child is fragile and deserves more than the mother has shown she can offer. The mother has not only been her own worst enemy, but her problems have caused her to be unable to provide the warm, stable, and secure relationship that her daughter so desperately needs. The delay has been harmful to T.D.C. We see no good reason to continue it. We find the following language appropriate here:

The termination statute is preventive as well as remedial. The statute mandates action to prevent probable harm to children and does not require delay until after the harm has been done.

We do not know how long Cheryl will remain in prison. We do not know whether she will rehabilitate her own life after she is released. We do know she has refused by her past conduct over a period of five years to provide her children with necessary parental care and attention. As observed in *Re Interests of Morrison Children v. State,* 259 Iowa 301, 310–311, 144 N.W.2d 97, 102–103 (1966), "This is a history of good intentions, but feeble resistance to temptation and wrongdoing, and little or no consideration for the unwholesome influences created or the moral and mental welfare of these children." In these circumstances we cannot gamble with the children's future. They must not be made to await their mother's maturity.

*In the Interest of Kester,* 228 N.W.2d 107, 110–11 (Iowa 1975).

The decision of the court of appeals is vacated. The trial court is affirmed.

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT AFFIRMED.