**In the Interest of J.R.S., A Child.**

**Appeal of C.S., Mother.**

**No. 89–763.**

Court of Appeals of Iowa.

Nov. 27, 1989.

Gary McKenrick of Gomez, May, McKenrick & Kelly, Davenport, for appellant mother.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., Judy Sheirbon, Asst. Atty. Gen., and Gerda Lane, Asst. County Atty., for appellee State.

Patricia Zamora, Davenport, guardian ad litem, for child.

Heard by OXBERGER, C.J., and DONIELSON and HAYDEN, JJ.

DONIELSON, Judge.

On September 17, 1986, C.S. gave birth to J.R.S.[1] C.S. was nineteen and unmarried when J.R.S. was born. During her pregnancy C.S. received counseling with regard to placing her baby for adoption. She was concerned she would not be able to provide for a baby emotionally, physically, or financially.

Following her release from the hospital on September 29, 1986, C.S. placed J.R.S. in voluntary foster care. C.S. subsequently changed her mind about adoptive placement, and on November 10, 1986, J.R.S. was returned to the custody of C.S. By mid-January 1987, C.S. was again questioning her ability to provide care for J.R.S., and she sought placement for J.R.S. through the juvenile court system. J.R.S. was returned to foster care on January 30, 1987. A CHINA order was filed on March 13, 1987. J.R.S. was adjudicated a child in need of assistance pursuant to section 232.-2(6)(b) (with regard to his father) and pursuant to section 232.2(6)(k) (with regard to C.S.).

On August 1, 1987, C.S. contacted Debbie Goodwin, her social worker. C.S. was extremely upset and she informed Ms. Godwin she was feeling pressure from her friend, Edie, and her new church, to resume custody of J.R.S. She stated she did not want J.R.S. back, but she was afraid she would not be saved and sanctified unless she tried to care for J.R.S. herself. C.S. talked of suicide during the conversation, and she was hospitalized that day. She was released from the hospital by August 5, 1987. C.S. increased her visitation with J.R.S., but she vacillated between her wish to surrender her parental rights, and her fear that doing so would make her a bad person in God's eyes.

A permanency/review hearing was held on April 22, 1988. The court rejected the Department of Human Services' (DHS) recommendation that the parental rights of C.S. should be terminated. Another perma-

---

1. The father of J.R.S. indicated some interest in parenting him, but he never followed through in this regard. The father's parental rights were terminated on April 18, 1987, and no appeal was taken from that decision.

nency/review hearing was held on October 14, 1988. Once again the court rejected a recommendation that the parental rights of C.S. be terminated. The court ordered the preparation of a plan to facilitate reunification of C.S. and J.R.S.

From November 1988 to January 1989, attempts were made to utilize the reunification plan. The objective of the plan was to have implemented a complete reunification by February 1, 1989. Visitation was increased and the length of the visits was extended. C.S. was provided guidance on the types of steps she would have to take to ensure the return of J.R.S. to her custody. C.S. was instructed to have her furnace fixed so her trailer would be heated; C.S. was told to furnish her home with the necessities required for a small child, i.e., a crib, high chair, etc.; C.S. was to obtain medical insurance coverage for J.R.S.; and she was supposed to ensure that the special therapy needs of J.R.S. would be continued in programs offered in her home state of Illinois.

On January 10, 1989, J.R.S. was to have his third overnight visit with C.S. At a meeting that day with her social worker, Maritia Griffith, and the foster mother, C.S. became emotionally upset. She indicated that during the Christmas season she had wanted to give J.R.S. to the foster family, but her roommate, Edie, had persuaded her not to do so. C.S. indicated she did not feel up to having J.R.S. for an overnight visit on this day, because Edie would not be there to offer support. C.S. then stated J.R.S. had cried all night during his last overnight visit.

During a meeting with DHS staff on January 20, 1989, C.S. indicated her intention to voluntarily surrender her parental rights. On February 6, 1989, C.S. signed a voluntary release of custody. On February 10, 1989, C.S. revoked the release of custody she had previously filed. A petition to terminate parental rights was filed on February 15, 1989. On April 18, 1989, an order terminating parental rights was entered. The juvenile court judge found C.S. to be unable to provide for the physical and emotional care of J.R.S. The judge further found C.S. would be unable to meet the special needs of a child like J.R.S., and the personal problems of C.S. would increase the risk that the needs of J.R.S. would be neglected. Termination of the parental rights of C.S. was predicated on Iowa Code section 232.116(1)(e).

C.S. appeals the decision of the juvenile court judge. She contends the State failed to establish by clear and convincing evidence, the child could not be returned to his mother's custody, or the child's best interests required termination of the mother's parental rights. Appellate review of termination proceedings is de novo. *In re W.G.*, 349 N.W.2d 487, 491 (Iowa 1984), *cert. denied*, 469 U.S. 1222, 105 S.Ct. 1212, 84 L.Ed.2d 353 (1985). We give weight to the findings of fact of the juvenile court, especially when considering the credibility of witnesses, but we are not bound by those determinations. *Id.* at 491–92. Children should not be forced to endlessly await the maturity of their parents. *In Interest of T.D.C.*, 336 N.W.2d 738, 744 (Iowa 1983). Termination must occur if twelve to eighteen months have elapsed since the child was removed from the home, and the parent still cannot take care of the child. *Id.* Evidence of a parent's past performance may be indicative of the quality of future care he or she is capable of providing. *In the Interest of Dameron*, 306 N.W.2d 743, 745 (Iowa 1981).

Iowa Code section 232.116(1)(e) (1989) permits the juvenile court to terminate the parent-child relationship if the child has been adjudicated in need of assistance, has been placed out of the parent's custody for more than twelve of the last eighteen months, and there is clear and convincing evidence the child will suffer harm specified in Iowa Code section 232.2(6) (1989) if returned to the parent. *See In re K.L.C.*, 372 N.W.2d 223, 227 (Iowa 1985). From our review of the record, this court is convinced the trial court did not err in terminating the parental rights of C.S.[2] She has

2. The trial court is not limited at the termination hearing to determining whether the facts justifying the initial CHINA adjudication still exist. It must only find that any of the defini-

exhibited a disturbing inability to commit to her child's care. There have been at least three occasions upon which C.S. made a decision to release custody of her son and then she later changed her mind. The DHS reports are replete with incidents in which C.S. has vacillated with regard to whether she can and will care for her son. This uncertainty no doubt stems from her own personal and psychological problems, but we cannot ignore the profound effect such ambivalence has had on J.R.S.

The record reveals C.S. has been diagnosed as having a "passive-dependent" personality. She suffers from severe anxiety and a lack of confidence, rendering it very difficult for her to make decisions and abide by them. When assessing a parent's ability to provide for a child's needs, we may consider the mental condition of a parent. Iowa Code § 232.116(2)(a) (1989). C.S.'s therapist, Chris McCormick Pries, testified C.S.'s anxiety can immobilize her and leave her unable to make a decision. Pries stated C.S. is simply not capable of making a voluntary decision of whether she can parent J.R.S. or not. Pries indicated a passive-dependent personality is not a transient state, but is the foundation of one's way of dealing with life. Pries offered little hope C.S. could become less dependent on others to control her life. Dr. Hutchinson, a psychologist who evaluated C.S., testified C.S.'s dependent nature would cause her to abdicate her role as a parent to the person upon whom she was currently dependent.

Throughout the testimony presented before the juvenile court, a consistent concern was raised whether C.S. could provide for the basic physical, emotional, and medical needs of J.R.S. J.R.S. is a child of many special needs and problems. He suffers from tunnel vision which may require future surgery. This vision problem makes it more difficult for him to maintain his balance, walk, and do other things. In addition, J.R.S. suffers from physical and fine motor delays. He walks at an odd gait and is clumsy for his age. He has communica-

tion difficulties and will likely need special education. He needs a lot of stimulation, special care, help with social skills, and speech development.

C.S.'s therapist expressed reservations as to whether C.S. could make the decisions necessary for J.R.S.'s medical care. Two social workers from Bethany Home also expressed concern that C.S.'s ambivalence toward parenting could result in the neglect of J.R.S.'s medical needs. Kim Riley–Quin, a foster care monitor for DHS, testified C.S.'s apparent total dependence on others to help her care for her son, is reflected in her inability to care for J.R.S. for extended periods without a friend for support being present.

Ordinarily, the passive and dependent nature of a parent would not appear to be critical to a decision to terminate parental rights. However, when considered in conjunction with C.S.'s vacillation on the issue of retaining custody of J.R.S., and the special emotional and physical needs of her son, it is apparent J.R.S. will suffer further harm if returned to the custody of C.S. She has repeatedly been unsure whether she can provide for her son's needs. Even prior to his birth she felt his best interests would be served by placing him for adoption. Yet C.S. has been torn between her desire to act in her son's best interests and her personal inability to make a permanent voluntary decision to release custody of her son. This ambivalence and uncertainty renders C.S. without the ability to be a decisive and effective advocate on behalf of her son. Such ability is especially important in a case like this in which the child's physical disabilities are such that a concerted effort will have to be made to ensure appropriate medical and therapeutic assistance is provided. C.S. has already indicated an inability to do this when she failed to substantially comply with the DHS requirements that she acquire health insurance for J.R.S., and make sure continuing therapeutic programs would be available for him in Illinois prior to his return to her custody.

tional grounds of a child in need of assistance in section 232.2(6) exist at the time of the termi-

nation hearing. *In Interest of A.M.S.,* 419 N.W.2d 723, 725 (Iowa 1988).

We are unwilling to continue to force J.R.S. to exist in the legal limbo of foster care, while his mother tries to sort out her conflicting feelings about her ability to care for him. The risk of neglect of J.R.S.'s needs is a distinct possibility in this case; to return him to his mother would subject him to the harmful effects inherent when parents are ambivalent in their commitment to parenting, and would also risk the possibility that his special medical and therapeutic needs would not be met.

The decision of the trial court is affirmed.

AFFIRMED.