# IN THE COURT OF APPEALS OF IOWA

No. 16-0909
Filed August 17, 2016

**IN THE INTEREST OF C.W. AND L.W.,**
**Minor children,**

**R.A., Father,**
Appellant.

_____

Appeal from the Iowa District Court for Johnson County, Deborah Farmer Minot, District Associate Judge.

A nineteen-year-old father appeals the termination of his parental rights to his two daughters. **REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**

Amy L. Evenson of Larson & Evenson, Iowa City, for appellant father.

Thomas J. Miller, Attorney General, and Kathrine S. Miller-Todd, Assistant Attorney General, for appellee State.

Sara Strain Linder of Bray & Klockau, Iowa City, for minor children.

Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

A nineteen-year-old father appeals the termination of his parental rights to his one- and two-year-old daughters. He raises four issues: (1) the Iowa Department of Human Services (DHS) did not make reasonable efforts to reunite him with his children and the juvenile court erred in waiving the reasonable-efforts requirement; (2) the State did not prove by clear and convincing evidence the children could not safely be returned to his custody; (3) termination of his parental rights is not in the children's best interests; and (4) an additional six months would be adequate time to achieve family reunification.

After our de novo review, we disagree with the juvenile court's determination clear and convincing evidence of aggravated circumstances justified waiving the reasonable-efforts requirement. Because the DHS did not provide opportunities for the father to visit his daughters during the sixth months after their removal from parental custody, we find severing the legal relationship premature. Accordingly, we reverse the termination order and remand for the father to be afforded an additional six months to work toward reunification with his children. *See* Iowa Code § 232.104(2)(b) (2015). During that time, the DHS should engage in reasonable efforts aimed at improving the father's parenting skills, including visitation consistent with the children's best interests.

## I. Facts and Prior Proceedings

Robert was seventeen years old when L.W. was born in November 2013. He testified he was at the hospital for her birth and was actively involved in her life when she was an infant. Although he did not live with the child's mother, both

parents agree he regularly helped with L.W.'s care, sometimes keeping the child in his custody overnight.

But Robert's criminal conduct hindered his parenting. He had a history of juvenile delinquency adjudications and received criminal convictions before his eighteenth birthday. He was convicted of domestic abuse assault against L.W.'s mother in 2014 and did not complete the required batterer's education program at that time. Robert's second daughter, C.W., was born to the same mother in April 2015. Shortly after her birth, Robert was arrested for violating a domestic abuse no-contact order, and he spent four months in jail. A few weeks after being released from jail, Robert was arrested on felony robbery and burglary charges.

Robert was incarcerated pending trial on those charges in late October 2015 when the DHS removed L.W. and C.W. from their mother's care. The removal occurred after the mother's sisters voiced concerns that the mother left the young children unattended in her apartment and was not providing for their basic needs. The parents stipulated to adjudication of L.W. and C.W. as children in need of assistance (CINA) at a hearing on November 2, 2015. At that time, the court ordered the parents to cooperate with paternity testing. The DHS placed the children with their maternal aunt.

After the CINA adjudication, Bryce Goll—who worked for Four Oaks as the Family Safety Risk and Permanency (FSRP) provider—met twice with Robert at the jail. Robert asked Goll for updates and photographs of the girls and discussed "what he wanted to do once he was out of jail," including "being able to see his daughters, getting a job, having stable housing." Goll testified Robert

expressed regret for not being available to help the children's mother "because he thought he could have been a good support" for her and the children.

Neither parent appeared for a dispositional hearing in December 2015. Robert's absence was due to a winter storm that prevented authorities from transporting him from the Muscatine County jail, where he was being held on Johnson County charges, to the Johnson County courthouse. While reunification remained the permanency goal, the dispositional order directed the DHS "to commence concurrent planning for the children," including home studies of any interested and appropriate relatives.

On January 12, 2016, Robert pleaded guilty to an amended charge of burglary in the second degree, and the State dismissed the robbery count. Robert was released pending sentencing and immediately contacted DHS caseworker Katie Kelly. At their meeting, Robert requested information about child-proofing his apartment, which she provided. The DHS worker gave him a copy of the case plan and told him she would make referrals to two organizations, the Family Minority Advocate and Parent Partners.[1] The worker also told Robert she could not tell from the court's order whether he was allowed to have visitation with the children before paternity testing was completed and she "would contact the county attorney to discuss that further." When Kelly contacted the county attorney, she was advised Robert could not have visits with L.W. and C.W. "until those results were received."

---

[1] The record contains conflicting evidence regarding whether representatives from these organizations actually contacted Robert, but the parties agree Robert did not receive any services from these organizations.

Soon after his release, Robert also contacted FSRP worker Goll. On January 29, they met at the apartment Robert shared with his girlfriend Kamil. Goll had no concerns about Kamil and considered her a "good and formal support" for Robert. Due to miscommunication with DHS worker Kelly, Goll set up a visit between Robert and his children for February 2, though the paternity testing was not completed until February 29. Both the FSRP worker and Robert believed that first visit went well. The FSRP worker reported Robert interacted appropriately with the children and asked for help when he needed it. Robert testified L.W. remembered him and was happy to see him.

The results confirming Robert's paternity were filed with the court on March 4, 2016.[2] Three days later, on March 7, the court held a permanency hearing. Neither parent appeared for the hearing. Robert contends he was not aware of the hearing or the fact he had been appointed new counsel after his previous attorney withdrew upon accepting a different position. At the termination hearing, Robert testified he mistakenly supplied an incorrect address on his application for court-appointed counsel in the CINA case, he moved several times, and he had trouble receiving notices of the hearings.

In its permanency order issued March 15, 2016, the juvenile court found aggravated circumstances existed and waived the reasonable-efforts requirement. The court reasoned:

> Since the removal, the DHS has offered an array of services, but the parents have failed to participate. The father has been incarcerated for lengthy periods of time due to repeated criminal

---

[2] The court noted paternity testing was delayed because the mother "never appeared for her appointments."

behaviors and failing to follow court orders. Even when released from incarceration, he has only visited the children once.

The order granted limited guardianship of the children to their maternal aunt and suspended visitation with the parents. The order also directed the State to file a petition to terminate parental rights.

Three days later and less than five months after the children's removal—on March 18, 2016—the State filed its petition to terminate parental rights. The petition alleged the father's rights should be terminated under Iowa Code section 232.116(1)(b), (e), and (h). One month later, at a pretrial conference on the petition, Robert requested visitation with his daughters pending the termination trial. The court denied his request because "the children had been moved to Des Moines and the court declined to initiate visits while the terminations were pending, especially since trial was set so quickly."

About three weeks before the May 3, 2016 termination hearing, Robert was hired as a prep chef at a restaurant in Coralville. About one week before the hearing, Robert received a ten-year suspended sentence and two years of probation on his burglary plea. In her May 2016 report, the guardian ad litem (GAL) summarized Robert's progress: "He has stable housing with his paramour, Kamil. He has a job at Monica's and is looking at finding an additional job. Robert has been successful on pretrial release with the Department of Corrections." The GAL expressed concern in her report about whether the DHS had provided appropriate reunification services but ultimately recommended termination at the hearing.

The juvenile court terminated the parental rights of both the mother and the father in a clear and comprehensive decision issued on May 12, 2016. The court recognized Robert had "taken a number of positive steps" to improve his life during the past four to six weeks. But the court noted: "Unfortunately, [he] did very little before that." For both parents, the court decided the State met its burden of proving termination was proper under section 232.116(1)(h). The court also decided termination of parental rights was in the children's best interests and the children's placement with a relative did not warrant denial of termination. *See* Iowa Code § 232.116(2), (3). Only Robert appeals the termination order.

## II. Standard of Review and Legal Principles

We review termination proceedings de novo. *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014). When so doing, we assess both the facts and the law and adjudicate the parties' rights anew. *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001). We give weight to the juvenile court's factual findings but are not bound by them. *In re D.S.,* 806 N.W.2d 458, 465 (Iowa Ct. App. 2011).

The State bears the burden to prove at least one statutory ground for termination by clear and convincing evidence. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). Evidence is "clear and convincing" when there are no serious or substantial doubts as to the correctness of the conclusions of law drawn from it. *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). Clear and convincing evidence is a less onerous burden than proof beyond a reasonable doubt but more demanding than a preponderance of the evidence. *In re B.B.*, 826 N.W.2d 425, 428 (Iowa 2013).

The relationship between a parent and child is constitutionally protected. *In re B.E.*, 875 N.W.2d 181, 187 (Iowa Ct. App. 2015). And "termination is an outcome of last resort." *In re B.F.*, 526 N.W.2d 352, 356 (Iowa Ct. App. 1994).

### III. Reasonable Efforts

Robert contends the DHS did not make reasonable efforts to reunite him with L.W. and C.W. and the juvenile court erred in finding clear and convincing evidence of aggravated circumstances to warrant waiving the reasonable-efforts requirement. We agree with his contentions.

Iowa law requires the DHS to "make every reasonable effort" to return children to their homes "as quickly as possible" consistent with their best interests. Iowa Code § 232.102(7); *see also C.B.*, 611 N.W.2d at 493. As defined in the statute, "reasonable efforts" are those measures that "make it possible for the child to safely return to the family's home." Iowa Code § 232.102(10)(a). In determining if the DHS has satisfied this requirement, the court considers "[t]he type, duration, and intensity of services or support offered or provided to the child and the child's family." *Id.* § 232.102(10)(a)(1).

The concept of reasonable efforts includes facilitating interactions between parents and children when the children are out of the home. *See C.B.*, 611 N.W.2d at 493. Visitation is "an important ingredient to the goal of reunification." *In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996).

In assessing Robert's claims, we are mindful the reasonable-efforts requirement "is not viewed as a strict substantive requirement of termination. Instead, the scope of the efforts by the DHS to reunify parent and child after removal impacts the burden of proving those elements of termination which

require reunification efforts." *See C.B.*, 611 N.W.2d at 493. We are also mindful the reasonable-efforts requirement can be waived in the limited circumstances specified in Iowa Code section 232.102(12).

In its March 15 order the juvenile court waived the reasonable-efforts requirement, finding clear and convincing evidence that aggravated circumstances existed, as set forth in section 232.102(12)(b). Under subsection 12(b), the court can find aggravating circumstances by applying section 232.116(1)(i). Section 232.116(1)(i) has three elements: (1) the children meet the definition of CINA "based on a finding of physical or sexual abuse or neglect as a result of the acts or omissions of one or both parents"; (2) clear and convincing evidence exists "that the abuse or neglect posed a significant risk to the life" of the children or "constituted imminent danger" to the children; and (3) clear and convincing evidence exists "that the offer or receipt of services would not correct the conditions which led to the abuse or neglect of the child within a reasonable period of time."

As a preliminary matter, Robert contends we can review the juvenile court's order waiving reasonable efforts in his appeal of the termination order. We agree. *See In re T.G.*, No. 12-1405, 2012 WL 5356135, at *2 (Iowa Ct. App. Oct. 31, 2012) (citing *C.B.*, 611 N.W.2d at 493–94); *see also In re A.C.*, 443 N.W.2d 732, 732 (Iowa Ct. App. 1989) (juvenile court order directing termination petition to be filed is not appealable final order).

Robert next asserts the aggravated circumstances identified by the juvenile court in waiving reasonable efforts "relate primarily to the mother who had failed to attend visits or maintain contact with the [DHS] or her attorney for

nearly three months." Robert points out the conditions that led to removal occurred while the children were in the mother's care. By contrast, Robert emphasizes his requests for visitation through the FSRP worker and the DHS were denied until paternity testing was completed. (Although the one visit between Robert and his daughters mistakenly allowed by the FSRP worker went well.).

We are persuaded by Robert's argument the record did not support the finding of aggravated circumstances in his case. Stated differently, we disagree there was clear and convincing evidence to show the offer or receipt of services to Robert would not correct the conditions which led to the abuse or neglect of the children within a reasonable period of time. The truth is we don't know whether services would have corrected the conditions that led to the neglect of L.W. and C.W. because Robert was not given a chance to develop a relationship with his daughters after his release from jail.

The removal of the children happened in late October 2015, while Robert was awaiting trial on felony charges. Undoubtedly, his failure to abide by the law and his resulting incarceration contributed to the difficult circumstances because he was unavailable to help the mother care for the two little girls. The juvenile court highlighted his "pattern of delinquency and criminal behavior that resulted in several periods of incarceration." But the clock did not start ticking in the CINA case until after removal. During the two months after removal that Robert spent in jail, he twice met with the FSRP worker—expressing interest in the children and his aspirations to be a better father. Other than meetings with the FSRP worker, it does not appear the DHS offered Robert any services while he was in

jail. Promptly after he was released in mid-January 2016, Robert met with both the FSRP worker and the DHS caseworker. But he was denied visitation until the test results confirming his paternity were filed with the court in early March. The court noted the testing delay was attributable to the mother's lack of cooperation and was not the father's fault.

Eleven days after the prohibition on Robert's visitation was lifted, the court waived the reasonable-efforts requirement and suspended visitation. In doing so, the court observed: "Even when released from incarceration, [Robert] has only visited the children once." This observation strikes us as undeserved. Robert asked for time with his daughters soon after leaving jail but was barred until paternity testing was completed; the one visit afforded by the FSRP worker was a fluke of miscommunication.

The concept of aggravated circumstances suggests "certain types of parental behavior" may justify eliminating the reasonable-effort requirement. *C.B.*, 611 N.W.2d at 493; *see, e.g.*, *In re Q.A.S.,* No. 13-1182, 2013 WL 5229746, at *3 (Iowa Ct. App. Sept. 18, 2013) (noting "behavior of the parents showed a continuing pattern of unamenability to services, lack of follow through in the important areas of drug treatment and mental health treatment, and a continuing dysfunctional relationship that prevents them from focusing on their child while they seek to fulfill each other's needs"); *T.G.*, 2012 WL 5356135, at *3 (explaining court waived reasonable efforts after father accused of sexual abuse refused to admit responsibility and failed to follow through with offered services); *In re C.I.W.-V.*, No. 03-0681, 2003 WL 22091631, at *1 (Iowa Ct. App. Sept. 10, 2003) (recounting mother was resistant to and uncooperative with services

offered and was verbally aggressive and belligerent toward service providers). The State offered no evidence Robert had resisted services. Just the opposite, his request for visitation in January was tabled until paternity testing was completed in March and his request for visitation in April was denied because the termination hearing was already scheduled for May. We do not find clear and convincing evidence of aggravating circumstances to justify waiving the DHS requirement to make reasonable efforts to unify Robert with his daughters.

In addition, we conclude the denial of visitation between Robert and his children constituted a failure to exert reasonable efforts to achieve reunification. *See In re K.L.P.*, No. 15-1371, 2015 WL 6507840, at *4–5 (Iowa Ct. App. Oct. 28, 2015) (finding the DHS failure to facilitate visitation with incarcerated parent was unreasonable); *In re E.C.-N.*, No. 12-0135, 2012 WL 1066883, at *3 (Iowa Ct. App. Mar. 28, 2012) (reversing termination order where the DHS failed to provide visitation due to generalized concerns).

## IV.  Additional Time

The father asserts, if he "were granted another six months and visits were resumed, he could demonstrate his good parenting skills and continue making positive changes in his life." We agree with his assertion.

To defer permanency, the court must identify specific factors, conditions, or expected behavioral changes forming its basis for deciding the need for removal of the children from their home "will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b).

In this case, the evidence showed Robert had stable housing with his girlfriend, new employment, and, so far, compliance with his conditions of

probation. He was participating, though belatedly, in batterer's education. The record also indicated Robert had family and other supportive community members to turn to for help. As Robert argues in his petition on appeal, if given an additional six months, he "could demonstrate that the positive changes he has made are permanent and that he is committed to being a law-abiding citizen."

In deciding to continue placement for another six months, we take into account that Robert was only a teenager when his daughters were born. *Cf. State v. Null,* 836 N.W.2d 41, 55 (Iowa 2013) (noting, in criminal sentencing case, the body of psychosocial studies showing "the human brain continues to mature into the early twenties" and tracing development to the prefrontal cortex that governs "executive functions," such as planning, anticipation of consequences, and impulse control). In terminating Robert's parental rights, the juvenile court was reasonable in its unease regarding his history of delinquent and criminal behavior. But the sentencing court saw enough promise in Robert to grant him a suspended term on his burglary plea. And despite just reaching the age of majority, Robert has taken meaningful steps to demonstrate a commitment to his role as a parent.

No predictions are perfect. While this court remains optimistic that Robert will continue to build on the positive changes in his life, we acknowledge success is not guaranteed. But the DHS, GAL, and juvenile court will be in a better position to assess Robert's ability to safely parent his daughters if he is allowed appropriate visitation during the six-month extension of time.

We view termination proceedings with a sense of urgency. *See C.B.*, 611 N.W.2d at 495. But this is not a case like *C.B.*, where the parent did not

cooperate with the DHS for eighteen months. *See id.* at 494 (recognizing law requires "full measure of patience with troubled parents who attempt to remedy a lack of parenting skills" but noting Iowa built that patience into the statutory scheme of chapter 232). Here, Robert cooperated with the DHS, but he did not receive his full measure of patience before the juvenile court waived the reasonable-efforts requirement and suspended visitation. His right to raise his children is an important interest requiring protection. *See In re P.L.*, 778 N.W.2d 33, 38 (Iowa 2010).

Ultimately, though, we are concerned with the best interests of L.W. and C.W. Reinitiating visitation with their father may disrupt their routines. But because they are in the custody of a relative rather than in foster care, we would not anticipate that placement to change based on the six-month extension. The presumption that their best interests would be served by reuniting with their father has not yet been rebutted in this case. *See In re T.D.C.*, 336 N.W.2d 738, 740 (Iowa 1983).

We reverse the termination order and remand this case for the juvenile court to enter an order granting the father's request for six more months to work toward reunification. During that time, the DHS shall provide reasonable services, including visitation consistent with the children's best interests.

**REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**