# IN THE COURT OF APPEALS OF IOWA

No. 19-0326
Filed July 3, 2019

**IN THE INTEREST OF P.S., T.S., and A.S.,**
**Minor Children,**

**E.E., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Palo Alto County, Ann M. Gales, District Associate Judge.

A mother appeals the termination of her parental rights. **AFFIRMED.**

Scott A. Johnson of Hemphill Law Office, PLC, Spencer, for appellant mother.

Thomas J. Miller, Attorney General, and Meredith L. Lamberti, Assistant Attorney General, for appellee State.

Ryan C. Buske of McMahon, Stowater, Lynch & Laddusaw, Algona, guardian ad litem for minor children.

Considered by Mullins, P.J., Bower, J., and Vogel, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**MULLINS, Presiding Judge.**

A mother appeals the termination of her parental rights to her children. She challenges the sufficiency of the evidence supporting the grounds for termination, contends termination is not in the children's best interests, and requests the application of a statutory exception to termination. The mother also argues the State failed to make reasonable efforts to facilitate reunification, requests additional time for reunification, and maintains a guardianship should be established in lieu of termination. The mother further asserts she received ineffective assistance of counsel.

## I.      Background Facts and Proceedings

E.E. is the mother of three children: A.S., born in 2008; T.S., born in 2011; and P.S., born in 2012. The children came to the attention of the Iowa Department of Human Services (DHS) in December 2016 upon information that the mother was using methamphetamine and marijuana while caring for the children. During the ensuing investigation, the mother admitted using marijuana but not while the children were in her care. She also admitted to using methamphetamine while the children were present. P.S. tested positive for marijuana and methamphetamine, T.S. tested positive for methamphetamine, and A.S. tested negative for all substances. The mother agreed to voluntarily place the children with relatives; all three children were ultimately placed with a maternal uncle.[1] After its investigation,

---

[1] After the mother agreed to place the children outside the home, P.S. and T.S. were initially placed with the children's father. After five days, he informed DHS that he could no longer take care of the children. The two children were then placed with the maternal uncle. The father had no other involvement with the children or the court during the pendency of this case and refused to engage in any services.

DHS returned a founded child-abuse assessment against the mother for denial of critical care.[2]  The mother was charged with neglect of a dependent person and child endangerment.  She was released from jail on bond with pretrial supervision.

In March 2017, the mother and father stipulated to the adjudication of all three children as children in need of assistance.  The court also continued the children's placement with the maternal uncle.  The court ordered the mother to submit to random drug testing and undergo a substance-abuse evaluation.  The court also ordered mental-health therapy for the children.  The mother completed an evaluation in March, which recommended extended outpatient treatment.

DHS provided supervised visitation for the mother.  On multiple occasions, the mother struggled with her behaviors during the visits.  The mother became defensive when her lack of supervision of the children was brought to her attention.  The mother complained about the DHS worker on social media. She also disparaged her brother and his fiancée about their care of her children and argued and yelled when returning the children to the maternal uncle's home.  This resulted in the maternal uncle's fiancée wanting to not have any contact with the mother unless the maternal uncle was present.  There were also reports that the children's doctor's office forbade the mother from attending the appointments due to her swearing and being loud and socially inappropriate while there.

The maternal uncle also reported the children were acting out and struggling with aggression and being "out of control."  It was noted that P.S. was sexually acting out with the maternal uncle's child.  The mother admitted that at one time

---

[2] In 2008, DHS also returned a founded assessment against the mother for denial of critical care.

she had cared for a friend's child and that child had "sexually perpetrated" against P.S. and T.S. In the dispositional order, the court ordered that P.S. undergo a psychiatric evaluation, which was completed at the end of May.

In July, after the police found the mother passed out in the driver's seat of a car at a gas station, she was arrested and charged with operating while intoxicated and possession of methamphetamine, prescription drugs, and drug paraphernalia. The mother pled guilty to possession of methamphetamine and was sentenced to fifty days in jail. The mother remained in jail until October, when she was released and placed on house arrest. While in jail, DHS provided supervised phone calls with the children.

The mother entered a substance-abuse treatment program in November. On November 28, P.S. was placed with the mother on the condition that if she left or was discharged unsuccessfully from the treatment program, P.S. would be removed from her care. The other children visited the mother at the treatment facility and it was noted that when all three children were together, they struggled to behave appropriately, which often overwhelmed the mother when she had no assistance. On January 3, 2018, the court placed the other two children with the mother with the same conditions as P.S. The program provider noted that once all three children were placed with the mother, her engagement in treatment decreased and she struggled to balance parenting with her treatment. The mother admitted that while on an approved pass, she smoked methamphetamine. After returning from another approved pass, she refused to drug test until four days later. She tested positive for methamphetamine. She also brought an unauthorized cell phone into the facility. On January 16, facility staff reported the mother slapped

one of the children in the face twice. The program discharged the mother the following day after she was not able to successfully complete the program, due to noncompliance and rule infractions. Due to the mother's discharge, the children were placed into separate foster homes. DHS provided supervised visitation.

In February, the mother was jailed due to her unsuccessful discharge from the treatment program, which constituted a violation of her pretrial supervision. On February 26, the district court accepted her guilty plea to one count of child endangerment and sentenced her to a suspended term of incarceration not to exceed two years. The court ordered the mother's release from jail and placed her on probation. As a condition of her probation, the court ordered the mother report to a residential treatment facility (RTF) once space was available.

In April, during a permanency review hearing, the court modified the permanency goal from reunification to termination of parental rights. The court also placed A.S. in the care of the paternal grandparents after her foster family provided notice that they could no longer provide A.S. a home. They had noted that after a visit with the mother, A.S. acted out, including lying, hiding things, acting distant, and refusing to listen. After the hearing, the mother was required to submit to a drug test. Officials noted she had a bottle sticking out of her pants. When asked what it was, the mother removed it from her pants and threw it onto the maternal grandmother's lap, who then covered it up. The bottle, filled with a urine-colored liquid was handed over to officials, who notified DHS. The mother's probation officer was also notified. While waiting to complete the test, the mother appeared anxious and fidgety. The mother eventually admitted that she had taken

an anxiety pill and "licked a substance" in another individual's home. She claimed that she did not purposefully use any substances. The test was negative.[3]

DHS conducted a home study and approved the paternal grandparents as a possible placement for the children. DHS, through interstate compact, also conducted a home study and approved the mother's cousin as a possible placement. The mother's cousin lives in Oklahoma.

The mother entered an RTF program in early June. On June 20, the State petitioned to terminate the mother's parental rights. It sought to terminate the mother's rights pursuant to Iowa Code section 232.116(1)(b), (e), (f), and (*l*) (2018). The court conducted a contested hearing over the course of five days from June to October 2018. The court filed its ruling on February 11, 2019, terminating the mother's parental rights to all three children.[4] The court terminated the mother's parental rights to P.S. pursuant to section 232.116(1)(e) and her rights to A.S. and T.S. pursuant to paragraphs (e) and (f). As noted, the mother appeals.[5]

## II.    Standard of Review

We review termination-of-parental-rights proceedings de novo. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* (quoting *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014)). "Our

---

[3] The record reflects DHS's belief that the mother had previously used other people's urine to pass drugs tests administered by her probation officer and substance-abuse counselor.
[4] The court terminated the father's parental rights to all three children after he voluntarily consented to the termination. He does not appeal.
[5] The mother filed post-trial motions for a new trial and reconsideration, but she filed her notice of appeal before the juvenile court heard the motions. The supreme court denied the mother's motion for a limited remand to allow the juvenile court to hear and address the motions, and the juvenile court dismissed the mother's motions for lack of jurisdiction.

primary concern is the best interests of the child." *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006).

> We use a three-step analysis to review termination of parental rights. First, we "determine whether any ground for termination under section 232.116(1) has been established." If we determine "that a ground for termination has been established, then we determine whether the best-interest framework as laid out in section 232.116(2) supports the termination of parental rights." Finally, if we conclude the statutory best-interest framework supports termination, "we consider whether any exceptions in section 232.116(3) apply to preclude termination of parental rights."

*A.S.*, 906 N.W.2d at 472–73 (quoting *In re M.W.*, 876 N.W.2d 212, 219–20 (Iowa 2016)).

### III.    Analysis

#### A.    Statutory Grounds for Termination

As to A.S. and T.S., the juvenile court terminated the mother's parental rights under section 232.116(1)(e) and (f). "When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record." *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). On appeal, the mother only appears to challenge the sufficiency of the evidence as to paragraph (e) and makes no argument challenging the sufficiency of the evidence to satisfy the elements of paragraph (f). Because the mother does not challenge the statutory grounds for termination under paragraph (f), she has waived her challenge and we do not need to discuss this step. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."); *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). Accordingly, we affirm the termination of the mother's parental rights to A.S. and T.S. under section 232.116(1)(f).

As to P.S., the mother challenges the sufficiency of the evidence supporting the statutory ground for termination cited by the juvenile court, section 232.116(1)(e).  Termination under paragraph (e) requires the State to establish:

> (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (2) The child has been removed from the physical custody of the child's parents for a period of at least six consecutive months.
> (3) There is clear and convincing evidence that the parents have not maintained significant and meaningful contact with the child during the previous six consecutive months and have made no reasonable efforts to resume care of the child despite being given the opportunity to do so.  For the purposes of this subparagraph, "significant and meaningful contact" includes but is not limited to the affirmative assumption by the parents of the duties encompassed by the role of being a parent.  This affirmative duty, in addition to financial obligations, requires continued interest in the child, a genuine effort to complete the responsibilities prescribed in the case permanency plan, a genuine effort to maintain communication with the child, and requires that the parents establish and maintain a place of importance in the child's life.

Iowa Code § 232.116(1)(e).

The mother only challenges the establishment of the third element, contending that the court erred in its determination that she failed to maintain significant and meaningful contact with P.S. during the six months prior to the termination hearing.  She argues the court failed to take into consideration the amount of time she actually had available to spend with P.S., citing restrictions placed by DHS and the RTF and her employment obligations.

While the mother has had contact with P.S. during the previous six consecutive months, her contact has not been "significant and meaningful" within the meaning of section 232.116(1)(e)(3), and she has not made "a genuine effort to complete the responsibilities prescribed in the case permanency plan."  At the beginning of the six months, the mother was given the opportunity to resume care

for P.S., along with the other children, when he was placed in her care while she was in treatment. We agree with the juvenile court's summary:

> Everything was in place for successful reunification to occur. The State had put [the mother's] pending criminal charges on hold pending her completion of the YWCA program. [The mother] was engaged in individual and group substance abuse counseling at the YWCA and received mental health services. There was on-site daycare for the children. Staff assisted residents with transportation to off-site appointments and also assisted residents with applying for housing and financial assistance.
>
> At that point, [the mother] needed to successfully complete the YWCA program, secure housing and employment, maintain sobriety and demonstrate the ability to parent her children appropriately, meet their needs and provide a safe, stable and substance abuse-free home for them. But [the mother] failed to accomplish any of this.

The mother "was discharged from the program for numerous rule violations, including failing to participate in programming, testing positive for amphetamines after returning from a weekend pass, and slapping [T.S.] in the face twice." After her discharge and the children's removal from her care, the mother did not affirmatively assume or attempt to assume the duties of a parent, and she failed to make a genuine effort to comply with the permanency plan requirements about her sobriety. She went into hiding after her discharge to avoid an active warrant and was eventually jailed. She also did not participate in substance-abuse treatment.

After exhibiting suspicious behavior during a court hearing in April 2018, she was asked to take a random drug test, where she was found to have a bottle of a urine-colored liquid in her possession. When questioned, she admitted she had licked an unknown substance that she found in an apartment she cleaned. The mother provided no financial support for P.S.'s care. While waiting for an opening in RTF, the mother delayed setting up appropriate housing and

employment, which would allow her to support and care for the children. "[P]arents must move quickly to rectify their personal deficiencies. 'Children simply cannot wait for responsible parenting. Parenting cannot be turned off and on like a spigot. It must be constant, responsible, and reliable.'" *In re T.J.O.*, 527 N.W.2d 417, 422 (Iowa Ct. App. 1994) (quoting *In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990)). We recognize that during March, April, and May 2018, the mother attended weekly visits with the children, but over the course of the six months, her contact was sporadic. Unlike the juvenile court, we do not quantify in hours the mother's time of contact with the children. Instead, we focus on the findings that during the last six months of the nearly a year and a half since the mother has provided daily care for the children, she failed to affirmatively assume the duties of a parent and failed to make a genuine effort to complete the responsibilities prescribed in the case permanency plan. On our de novo review of the record, we find clear and convincing evidence supports terminating the mother's parental rights to P.S. under section 232.116(1)(e).

B.      Best Interests

In our determination of whether termination is in the children's best interests, we "give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2). "Insight for the determination of the child's long-range best interests can be gleaned from 'evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing.'" *A.B.*, 815 N.W.2d at 778 (quoting *In re C.B.*, 611 N.W.2d

489, 495 (Iowa 2000)). Based upon the record, we find termination is in the best interests of the children.

C.    Exceptions to Termination

The mother contends the juvenile court erred by not fully considering and then declining to apply a statutory exception to termination contained in Iowa Code section 232.116(3). The juvenile court considered and declined to apply the exceptions contained in section 232.116(3)(a) and (c).

The juvenile court need not terminate a parental relationship if it finds a statutory exception under section 232.116(3) applies. The application of a statutory exception to termination under section 232.116(3) is "permissive, not mandatory." *M.W.*, 876 N.W.2d at 225 (quoting *A.M.*, 843 N.W.2d at 113). "We may use our discretion, 'based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship.'" *Id.* (quoting *A.M.*, 843 N.W.2d at 113). It is the mother's burden to prove an exception to termination applies. *See A.S.*, 906 N.W.2d at 476.

Paragraph (a) permits the court to refrain from terminating the parental relationship if "[a] relative has legal custody of the child." Iowa Code § 232.116(3)(a). Here, only A.S. is in the custody of relatives, namely the paternal grandparents. The juvenile court considered this exception and declined to apply it, finding that A.S. "needs permanency now" and "needs to be able to count on reliable, permanent caregivers." Based upon the circumstances presented here, we agree A.S. needs permanency and the grandparents' custody does not preclude termination. We decline to apply this exception.

Paragraph (b) permits the court to refrain from terminating the relationship between the child and parent if the child "is over ten years of age and objects to the termination." *Id.* § 232.116(3)(b). The mother contends A.S., who is ten years old, as well as all the other two children want to be placed in her custody, citing a June 2018 guardian ad litem (GAL) report. "Preferences of minor children while not controlling are relevant and cannot be ignored." *In re Marriage of Ellerbroek*, 377 N.W.2d 257, 258 (Iowa Ct. App. 1985). However, "deciding custody is far more complicated than asking children what parent they want to live with." *Id.* Upon our review of this report, we find no indication that A.S., or any of the children, strongly or otherwise oppose the termination of the mother's parental rights. Instead, we find the report merely identified the children's feelings about their current placements as well as their mother. The GAL reported the children have a bond with the mother and looked forward to an upcoming visit but have also bonded with their respective caretakers and each feel safe in their current environments. Further, the GAL reported the children "wouldn't be opposed to remaining with their current [caretakers]." The children also "would love to live with their mother" but "understood that living with her may not be a possibility." Based upon on the circumstances in this case and the best interests of the children, we decline to apply this exception to termination.

Paragraph (c) provides the juvenile court need not terminate the parental relationship if "[t]here is clear and convincing evidence that the termination would be detrimental to the child[ren] at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). Though there is a bond between the mother and the children, we do not find this bond outweighs the children's need

for stability and permanency. While we must have a "full measure of patience with troubled parents who attempt to remedy a lack of parenting skills, . . . [o]nce the limitation period lapses, termination proceedings must be viewed with a sense of urgency." *C.B.*, 611 N.W.2d at 494–95. We will not delay the children's permanency any longer, and we decline to apply this exception to termination.

The mother also argues paragraph (e) serves to preclude termination. Paragraph (e) permits the court to forego termination if it finds "[t]he absence of a parent is due to the parent's admission or commitment to any institution, hospital, or health facility." Iowa Code § 232.116(3)(e). "[I]nstitution" in paragraph (e) is not intended to include correctional facilities or penal institutions. *See In re J.V.*, 464 N.W.2d 887, 890 (Iowa Ct. App. 1990), *overruled on other grounds by P.L.*, 778 N.W.2d at 39–40. Accordingly, this paragraph does not apply.

Like the juvenile court, we find no statutory exception precludes the termination of the mother's parental rights.

D.    Reasonable Efforts

The mother asserts DHS failed to provide reasonable efforts to facilitate reunification with the children. She argues DHS failed to facilitate visitation between the three children and ceased her visitation with the children in August 2018. She also complains that she and the DHS caseworker, who worked with the mother's family when she was a minor placed in foster care, had a history of "bad blood."

DHS must provide "every reasonable effort to return the child[ren] to the child[ren]'s home as quickly as possible consistent with the best interests of the child[ren]." Iowa Code § 232.102(9). Reasonable efforts are those

14

efforts made to preserve and unify a family prior to the out-of-home placement of a child in foster care or to eliminate the need for removal of the child or make it possible for the child to safely return to the family's home. Reasonable efforts shall include but are not limited to giving consideration, if appropriate, to interstate placement of a child in the permanency planning decisions involving the child and giving consideration to in-state and out-of-state placement options at a permanency hearing and when using concurrent planning. If returning the child to the family's home is not appropriate or not possible, reasonable efforts shall include the efforts made in a timely manner to finalize a permanency plan for the child. A child's health and safety shall be the paramount concern in making reasonable efforts.

*Id.* § 232.102(12). Reasonable efforts must continue until the juvenile court enters its final order of termination of paternal rights. *In re L.T.*, 924 N.W.2d 521, 528 (Iowa 2019). "The reasonable efforts concept would broadly include a visitation arrangement designed to facilitate reunification while protecting the child[ren] from the harm responsible for the removal." *In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996). However, the obligation to provide reasonable efforts "does not necessarily *require* DHS to provide reasonable efforts toward reunification." *L.T.*, 924 N.W.2d at 528 (emphasis added). "[T]he interests of the child[ren] take precedence over family reunification." *Id.* at 529.

First, with regards to the DHS-caseworker claim, the mother failed to challenge the caseworker's involvement before the termination hearing. "While the State has the obligation to provide reasonable reunification services, the mother had the obligation to demand other, different or additional services prior to the termination hearing." *In re S.R.*, 600 N.W.2d 63, 65 (Iowa Ct. App. 1999). "[V]oicing complaints regarding the adequacy of services to a social worker is not sufficient. A parent must inform the juvenile court of such challenge." *In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002). The mother made no such challenge to the

court, therefore the mother has waived the issue. *See id.* ("In general, if a parent fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding.").

Second, the mother does not explain how sibling visitation would have assisted in "eliminat[ing] the need for the removal of the child[ren] or make it possible for the children for the child[ren] to safely return to the family's home." We "will not speculate on the arguments [the mother] might have made and then search for legal authority and comb the record for facts to support such arguments." *Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996). We therefore consider this argument waived. *See* Iowa R. App. P. 6.903(2)(g)(3).

Finally, the mother claims the State damaged the bond between her and the children by suspending her visitation during the pendency of the termination hearing. The mother visited with the children in August 2018. In September, T.S.'s therapist reported the child was having issues after visitations with the mother and determined the visits were detrimental to T.S. DHS and the State suspended the mother's visits with all three children after receiving the report, not based upon the mother's parenting during visits but because of the adverse reactions. After the end of the fourth day of the termination hearing, October 3, the court discussed the situation with the parties. The foster parents to T.S. and P.S. identified the reactions the children were having to the court. Because A.S. was not having adverse reactions, the court resumed visitation with A.S. It also resumed telephone contact with T.S. Visitation and phone contact with P.S. remained suspended due to concerns about P.S.'s enuresis, anxiety, and nightmares relating to the past sexual abuse. The court did allow the mother to write to P.S.

and explained that it would decide the visitation issue by the time of the final day of the termination hearing, October 11. After the final day, the court ordered in-person visitation and telephone contact between the mother and A.S. to continue. The court ordered supervised visitation between the mother and T.S. and P.S. to be conducted through video conferencing and telephone calls. The court further allowed the mother to send DHS-approved cards and gifts through the mail to the children.

Visitation "is an important ingredient to the goal of reunification. However, the nature and extent of visitation is always controlled by the best interests of the child." *M.B.*, 553 N.W.2d at 345. Concerns about the effects visitation with the mother was having on all the children is evident in reviewing the record. The court's order after each hearing during the pendency of this case stated that visitation would be at DHS discretion. We recognize that a letter about one child's reaction to visitation did not necessarily mean the other children were suffering, so the suspension of all visitation may have been an overreaction, but it was not unreasonable given the history in this case. On our de novo review, we do not find that it permanently damaged the bond between the mother and the children as the mother claims. It was for only a short period of time and once fully apprised of the situation, the juvenile court resumed visitation with the children, though restricted the type with regard to T.S. and P.S. Based upon our review of the record, we find DHS made reasonable efforts to facilitate the reunification of the mother and children.

E.    Guardianship

The mother also argues that the juvenile court should have established a guardianship with the paternal grandparents for all three children.   "[A] guardianship is not a legally preferable alternative to termination." *A.S.*, 906 N.W.2d at 477 (quoting *In re B.T.*, 894 N.W.2d 29, 32 (Iowa Ct. App. 2017)).   A guardianship, rather than termination, would not promote stability or provide permanency to the children's lives.   *See In re R.S.R.*, No. 10-1858, 2011 WL 441680, at *4 (Iowa Ct. App. Feb. 9, 2011) ("So long as a parent's rights remain intact, the parent can challenge the guardianship and seek return of the child[ren] to the parent's custody.").

The juvenile court concluded a guardianship would not be a suitable alternative to termination in this case. Upon our review of the case, we agree. Though the paternal grandparents may be willing to care for the children, "[a]n appropriate determination to terminate a parent-child relationship is not to be countermanded by the ability and willingness of a family relative to take the child[ren].  The child[ren]'s best interests always remain the first consideration." *In re C.K.*, 558 N.W.2d 170, 174 (Iowa 1997).   Even if a guardianship were established, the mother has failed to meet her burden to show that a guardianship should preclude termination.  We decline to grant a guardianship.

F.    Extension

Finally, the mother argues the juvenile court erred in denying her an extension to allow for reunification.  She argues that her gainful employment, engagement in services, and her impending discharge from the RTF all provide reasons for the juvenile court to grant her additional time.  The mother's counsel

further argues that he was ineffective for failing to file a motion to reopen the record to introduce additional evidence regarding the mother's employment, housing, and her December 2018 discharge from RTF.[6]  This prevented the juvenile court from considering that evidence in its determination of whether to grant an extension to the mother.  In addition, counsel contends he was ineffective for filing the appeal of the termination before the juvenile court could render a decision on the mother's post-trial motions to reconsider and a new trial.  Both post-trial motions sought to have the mother's RTF discharge, housing, and gainful employment included in the court's consideration of the termination petition and request for an extension.

"The test for ineffective assistance of counsel in termination cases is generally the same as in criminal proceedings."  *In re A.R.S.*, 480 N.W.2d 888, 891 (Iowa 1992).  The mother must establish that "(1) counsel's performance is deficient, and (2) actual prejudice resulted."  *Id.*; *accord Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Even if the mother's counsel had waited to file the appeal until after the juvenile court decided her post-trial motions, the mother concedes the court was already aware of the information she claims the court should have taken into consideration.  The mother was in RTF during the hearing, and she testified her expected discharge date was in December.  Further, the mother was employed at the same job during the hearing where she currently works.  The mother also testified she was in search of appropriate housing for her and the children once she was released from RTF.

---

[6] The last day of the termination hearing was October 11, 2018.  The order terminating parental rights was filed February 11, 2019.

Furthermore, the evidence she sought to introduce into evidence all came into existence after the last day of the hearing. The court was required to make its decision based on the evidence in existence and admitted at the hearing. Notwithstanding counsel's willingness to "fall on the sword" of perceived shortcomings, after our review of the seventy-four-page ruling detailing facts and conclusions of law, we are not convinced the court would have granted a motion to reopen the record. Consequently, we find the mother cannot establish counsel failed to perform competently or that she suffered actual prejudice. Accordingly, we find her ineffective-assistance-of-counsel claims fail.

Section 232.104(2)(b) permits the juvenile court to continue the placement of children for an additional six months to allow for reunification if the court finds "the need for removal . . . will no longer exist at the end of the additional six-month period." While the mother has made progress, that progress simply came too late. The mother failed to earnestly respond to services until the termination hearing had already commenced. Further, she had to restart the RTF program due to her infractions while in the program. "A parent cannot wait until the eve of termination, after the statutory time periods for reunification have expired, to begin to express an interest in parenting." *C.B.*, 611 N.W.2d at 495.

The juvenile court noted during the pendency of this case the children "have been on an emotional roller coaster with their mother. . . . Each of the children has been disappointed time and again by [the mother]." "[A]t some point, the rights and needs of the children rise above the rights and needs of the parent." *In re C.S.*, 776 N.W.2d 297, 300 (Iowa Ct. App. 2009). We agree with the juvenile court that "[g]ranting [the mother's] request for more time would only prolong the

children's time in parentless limbo awaiting a forever home." We decline to delay the children's permanency any longer.

We affirm the termination of the mother's parental rights.

**AFFIRMED.**