In the Interest of J.V., and C.W., Jr., Minor Children.

L.W., Mother, Appellant,

C.W., Sr., Father, Appellant.

No. 90–547.

Court of Appeals of Iowa.

Oct. 23, 1990.

As Corrected March 26, 1991.

Sally H. Peck, Iowa City, for appellant mother.

Mary K. Hoefer of Mears, Zimmermann & Mears, Iowa City, for appellant father.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., Kathrine S. Miller–Todd, Asst. Atty. Gen., for appellee State.

Stephen N. Greenleaf of Lynch & Greenleaf, Iowa City, guardian ad litem for children (appellee).

Heard by SCHLEGEL, P.J., and HAYDEN and HABHAB, JJ.

SCHLEGEL, Presiding Judge.

The natural father, C.W. Sr., appeals the termination of his parental rights with respect to C.W. Jr. The natural mother, L.W., separately appeals the termination of her parental rights with respect to C.W. Jr. and J.V. The State and the guardian ad litem resist the appeal, urging that all statutory prerequisites have been satisfied and all necessary burdens carried. We affirm.

Our review is de novo. Iowa R.App.P. 4. Although we give weight to the findings of the trial court, especially in matters concerning the credibility of witnesses, we are not bound by them. Iowa R.App.P. 14(f)(7). Our overriding concern is the best interests of the child. Iowa Code § 232.116(2) (Supp.1989) (primary consideration to physical, mental, and emotional condition and needs of child); Iowa R.App.P. 14(f)(15).

## I.

L.W. was fourteen years old in 1985 when she gave birth to J.V. J.V.'s natural father's whereabouts are unknown, and he is not a party in this action; there had been no disposition on his parental rights at the time this appeal was taken. L.W. and C.W. Sr. were married in January 1987, and a few months later C.W. Jr. was born. For reasons discussed in detail below, in October 1987 J.V. and C.W. Jr. were adjudicated children in need of assistance (CINA) pursuant to Iowa Code sections 232.2(6)(b) (past or imminent abuse or neglect) and 232.2(6)(c)(2) (past or imminent failure to provide reasonable care). The children continued to reside with their parents until March 1988, when they were placed in foster care. In November 1989 L.W. had another child, C.E.W. In January 1990, citing many of the same problems as occurred with J.V. and C.W. Jr., the juvenile court removed C.E.W. from his parents; however, C.E.W. is not a subject of the present appeal. The persistent problems noted by service providers and the juvenile court have ranged from maintaining a dirty, unsanitary, or hazardous household to lack of basic parenting skills to denial of critical nutritional and medical care.

The record shows that the home was persistently in a squalid and unsanitary condition, if not hazardous. L.W. and C.W. Sr. allowed cat litter, cat food, knives, birth control pills, cortisone creme, cigarette butts, dirty diapers, and broken glass to be within reach of the children. Stale food and dirty dishes were left about, and insect problems were apparent. Dried food and dirt were on the floor, and the baby crib contained dried feces.

It is clear from the record that the children were often left unattended and, when handled, were cared for improperly. The parents did not hold the children during feeding and did not provide appropriate support when they picked them up. The infants were transported on the back of bicycles without safety gear and in a seat that did not have a seat belt. The children had a number of bruises, and C.W. Jr. had been scratched on his head by a cat. When clothed, the children's outfits and diapers were soiled and either soaked or left until dried. The children were rarely changed or bathed; they had food matted in their hair and dried secretions under their noses, and they smelled of urine and feces. The record shows the children were often without diapers and were left to urinate and defecate on themselves. Both had constant and severe rashes.

The parents were consistently evasive or vague about the frequency and amount of feeding. Likewise, they were evasive about the frequency and amount of medi-

cation administered to the children. In both cases, however, it was clear that the children were not receiving appropriate amounts regularly. It was also clear that the parents refused to mix the baby's formula in the correct proportions. The children were occasionally given sour or curdled milk, or drank from bottles having mold in them. This was despite frequent vomiting and diarrhea.

The children have had numerous medical problems. Both parents and children have received services since J.V.'s birth in 1985, but concern remains that the parents have failed to provide critical medical services and necessary prescriptions and other medical aids. J.V. has a hip dysplasia and requires the use of a brace to prevent arthritis, but the parents refused to provide, and later refused to make the child wear the brace, and would not submit to x-rays to determine the extent of the problem. Both children suffered severe ear infections that persisted over a period of months, but the parents failed to obtain and later failed to use prescriptions. J.V.'s condition was chronic, she had tubes placed in her ears, and again the parents failed to obtain and apply prescriptions to the child. A visiting nurse discovered C.W. Jr. had an inguinal hernia, but the parents did not have this repaired for two months, despite advice that an operation be scheduled immediately.

Both children have exhibited subnormal growth which has persisted during foster care. This includes both size and weight. In addition, both children have delayed development of language and cognitive abilities. One study characterized J.V. and C.W. Jr. as emotionally "at risk."

C.W. Sr. has been incarcerated in county jail at least three times, once before the children were removed and twice after. From November 1987 to January 1990 C.W. Sr. served eighteen months in jail and was free for eight. The record shows he served time for assaulting L.W. on numerous occasions, walking away from his work release site, and driving while his license was under suspension. That C.W. Sr. has assaulted L.W. several times is consistent with his psychological profile which indicates some aggressive tendencies. At the time this appeal was taken, the parents were in the process of getting a divorce.

There was no evidence that the children had been physically or sexually abused. The record shows no substance abuse by either parent. Tests show L.W. and C.W. Sr. both are of slightly below average intelligence, neither having finished high school or general educational classes, but in their respective briefs they argue vigorously that they, or one of them, can provide an appropriate environment and care. In spite of a clear lack of nurturing, there was some bond between parents and children.

The State has provided various daily and weekly services throughout in an attempt to help L.W. and C.W. Sr. keep their family intact. The record shows frequent contact by various service organizations designed to aid the parents and teach them basic life and parenting skills. Both parents were in the home during most of the year before the children were removed when intensive services were provided and observations taken. The record is rife with examples of uncooperativeness and refusals to follow the most basic instructions, even when the instructions pertained to the health of the children.

The juvenile court found the statutory elements for termination of the parental rights of both parents as to the children had been satisfied. The court relied upon section 232.116(1)(e) for rights pertaining to J.V. and section 232.116(1)(g) for rights pertaining to C.W. Jr. Subsection (e) applies to children age 4 and older, and subsection (g) applies to children age 3 and younger. Both sections essentially require a CINA adjudication and that the child be out of the parental home for a period of time, but subsection (e) requires the child be out of the home for a longer period of time before termination proceedings than does subsection (g). Both subsections also require the court to find clear and convincing evidence that the child cannot be returned to parental custody as provided in section 232.102. The trial court found this to be the only fighting issue.

Section 232.102 governs the transfer of custody and placement of children. Subsection (4)(b) requires the court to find by clear and convincing evidence that the child cannot be returned to parental custody because the child would be exposed to "some harm which would justify the adjudication of the child as a child in need of assistance" and "reasonable efforts have been made to prevent or eliminate" the harm. If custody is transferred to foster care authorities, subsection (6) requires "every effort" be made "to return the child to the child's home as quickly as possible consistent with the best interest of the child." The trial court found all of the foregoing conditions existed and terminated the rights of the parents under section 232.117. The parents appeal; the State and the guardian ad litem resist.

## II.

■■■ C.W. Sr. argues the trial court erred in finding that section 232.116(3)(e) of the Iowa Code did not apply to C.W. Sr. That section provides, "The court need not terminate the relationship between parent and child if the court finds ... [t]he absence of the parent is due to the parent's admission or commitment to any institution, hospital, or health facility or due to active service in the state or federal armed forces." In particular, C.W. Sr. contends the word "institution" includes "penal institutions" or correctional facilities. We are bound to give statutes a reasonable construction based on their context and, if ambiguous, the object sought to be obtained. Iowa Code §§ 4.1(2), 4.6(1) (1989).

First, we note that section 232.116(3) contains no mandatory language. We believe it is self-evident in the words "[t]he court *need not terminate* the relationship" that the legislature did not intend this to be a mandatory provision. Unlike the words "shall not terminate," which would impose a duty, *id.* § 4.1(36)(a), or "must not terminate," which would state a requirement, *id.* § 4.1(36)(b), the words "need not terminate" clearly are permissive. Thus, even if we find that the word "institution" includes correctional facilities, it is within the sound discretion of the court, based upon the unique circumstances before it and the best interests of the child, whether to apply section 232.116(3)(e) to save the parent-child relationship.

Next, we examine the word "institution" to see whether the legislature intended this to include correctional facilities, including state penitentiaries and county or other local detention facilities. Juxtaposed with the words hospital and health facility, it seems unlikely that the legislature intended "institution" to mean correctional facility here. Looking to the overall context of this subsection in chapter 232, we believe our interpretation is supported by sections 232.116(1)(i)(2) and 232.116(2)(a) which specify that parental incarceration is a ground supporting termination. Likewise, the legislature has recently added section 232.-2(6)(n), which makes parental incarceration a ground for a CINA adjudication. A contrary interpretation would rob these other sections of their natural import. Given the general objects of chapter 232 of providing for the best interests of the child within the constraints of due process to the parents, we conclude the word "institution" in section 232.116(3)(e) was not intended to include penal institutions.

## III.

■■ C.W. Sr. challenges the sufficiency of the evidence to support a termination of his parental rights with respect to C.W. Jr. In particular, C.W. Sr. argues that the State failed to adduce sufficient evidence under section 232.116(1)(g). We disagree.

The evidence shows a clear possibility that, if returned, the child would be subjected again to "some harm which would justify" a CINA adjudication. Iowa Code § 232.102(4)(b) (1989). The record reveals a clear pattern of neglect of these children's needs in both body and spirit. The record also shows little, if any, cooperation and a growing number of examples of aggressive incidents consistent with a psychological profile of aggressive behavior. The trial court heard and weighed the credibility of C.W. Sr. and another witness with respect to his change in outlook and behav-

ior, and it terminated his rights. We find that C.W. Jr. would be likely to be neglected, would suffer harm from a lack of reasonable care in supervision, or would suffer from a lack of reasonable care in providing adequate nutrition or essential medical care. *See id.* §§ 232.2(6)(b), 232.-2(6)(c)(2), 232.2(6)(g). As we have said many times, a child should not be forced to wait in limbo indefinitely for a parent to mature. *In re T.D.C.*, 336 N.W.2d 738, 744 (Iowa 1983). Our de novo review based on the parent's past performance, which we find indicative of the quality of future care, *see In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981), leads us to conclude there is clear and convincing evidence to show that C.W. Jr. could not be returned to the custody of his father.

### IV.

■ C.W. Sr. contends the Department of Human Services failed to make reasonable efforts to return C.W. Jr. to his father's home. We find this argument to be without basis in the record. C.W. Sr. received exhaustive services both before and after the removal of the children. Again, we do not think C.W. Jr. should be made to wait forever for C.W. Sr. to put his life on track. *T.D.C.*, 336 N.W.2d at 744; *Dameron*, 306 N.W.2d at 745. Our statutes require clear and convincing evidence that "reasonable efforts have been made to prevent or eliminate the need for removal of the child." Iowa Code § 232.102(4)(b) (Supp.1989). We hold that there is clear and convincing evidence that reasonable efforts have been made pursuant to section 232.102(4)(b), and as indicated above, C.W. Jr. could not be returned to the custody of his father.

### V.

■ We next consider L.W.'s several assignments of error together. L.W. contends that the trial court erred in finding there was clear and convincing evidence showing that the children's developmental delays were caused by her home environment. L.W. contends there is no clear and convincing evidence that she had not made

significant progress in parenting skills or that she had received reasonable services. Although it is less than clear from L.W.'s brief, we take this to be a challenge to the court's findings under sections 232.-116(1)(e)(3) and (g)(3) and section 232.-102(4)(b) that the children could not be returned because there was "some harm which would justify the adjudication of the child as a child in need of assistance." L.W. also suggests the trial court erred by relying on evidence relating to C.E.W., L.W.'s third child.

We find all of L.W.'s arguments unpersuasive. We have set out an extensive recitation of the evidence in this case above, and there is no need to repeat it here. Even if we accept appellant's argument that she is not causally responsible for the developmental delays in her children, we think the record reveals clear and convincing evidence of countless instances of her neglect of the children's medical, nutritional, and other basic needs, and given her past performance, *see Dameron*, 306 N.W.2d at 745, there is no indication that this will change. *See* Iowa Code §§ 232.2(6)(b), 232.2(6)(c)(2), 232.2(6)(g) (1989). Here, again, the children should not be forced to wait indefinitely for L.W. to mature. *T.D.C.*, 336 N.W.2d at 744. After our de novo review of the record, we conclude there is clear and convincing evidence that the children could not be returned to the custody of their mother because they would suffer, or would be imminently likely to suffer, some harm which would justify a CINA adjudication.

### VI.

■ L.W. argues that the guardian ad litem provided ineffective assistance to the children. C.W. Sr. joined L.W. in oral argument contending the guardian ad litem had failed to act independently and had simply adopted the State's position. All of the counsel herein candidly admit there is a pervasive and difficult problem in providing significant, independent counsel for minor children involved in CINA and termination proceedings. Putting to one side the questions of the parents' standing to

raise these issues, we are not convinced there was ineffective assistance of counsel in this case. Nevertheless, in the interest of justice and because the children are by definition legally unable to help themselves, it is our responsibility to evaluate the performance of the guardian ad litem, *sua sponte* if necessary. Furthermore, we believe this topic is one of such transcendent concern that it is worthy of further examination and comment.

The guardian ad litem in this case was present at all of the formal proceedings in this case from the original CINA proceedings through oral arguments before this court. He interviewed the parties and reviewed the records. He did not visit any of the various homes appellants maintained. He did not introduce any witnesses. He did not interview the parents or the service providers after the earliest proceedings. Under the circumstances of this case, we can only describe this as being at the barest minimum of adequacy. The guardian ad litem makes the point that he listened to all of the evidence and believes it to be in the best interest of the children that their relationship with their parents be terminated. That, of course, is the conclusion reached by the county attorney, the department of human services, and the juvenile judge.

Iowa Code section 232.2(20) defines "guardian ad litem" as "a person appointed by the court to represent the interest of a child in any judicial proceeding to which the child is a party." Section 232.89(2) directs the court, upon filing of a petition in a CINA matter, to "appoint counsel and a guardian ad litem for the child identified in the petition as a party to the proceedings." Section 232.89(4) allows counsel to serve as guardian ad litem. Numerous provisions of chapter 232 require hearings or consent of the parties, and the guardian ad litem is required to attend or consent.

In *In re J.P.B.*, 419 N.W.2d 387, 390 (Iowa 1988), and *In re D.W.*, 385 N.W.2d 570, 579 (Iowa 1986), the Iowa Supreme Court applied the principles of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), in consid-

ering the issue of ineffectiveness of counsel in a proceeding to terminate parental rights. Those courts held that a claim of ineffective assistance must be supported by evidence of a deficient performance and actual prejudice. *Strickland* 466 U.S. at 687, 104 S.Ct. at 2064; *J.P.B.*, 419 N.W.2d at 390; *D.W.*, 385 N.W.2d at 579. The Iowa Supreme Court reaffirmed the application of the *Strickland* test in *J.P.B.*, 419 N.W.2d at 392, and held that they would be "unwilling to presume prejudice even if under ordinary criminal standards a substantial possibility of conflict [of interest] would be shown." *Id.* The *J.P.B.* court also stated:

> We are mindful that in the ordinary lawyer-client relationship, the lawyer's role is not to *determine* the client's interest but to *advocate* the client's interest. *See* Iowa Code of Professional Responsibility for Lawyers DR7–101 (representing a client zealously requires that a lawyer shall not intentionally fail to seek the lawful objectives of a client). Such a duty may present an ethical dilemma in a juvenile proceeding where the objective is *always* the best interest of the child, not the child's personal objective. We are aware that the unsettled law in this area offers no clear direction to an attorney faced with such a predicament.

*Id.* at 391 (citation omitted). The legislature has done little to assuage the dilemma, stating: "the court may appoint a separate guardian ad litem, if the same person cannot properly represent the legal interest of the child as legal counsel and also represent the best interest of the child as guardian ad litem." Iowa Code § 232.89(4) (Supp. 1989).

From an economic standpoint it is clear that having the guardian ad litem serve as legal counsel often is an efficient use of both human and monetary resources. We also believe that separation of the functions of guardian ad litem and counsel is an option too seldom used and that bench and bar are much too reluctant to seek its use, perhaps for the most insidious of reasons, and the clearest conflict of interest, viz., that a person performing two functions

may be entitled to more compensation than a person performing one.

Given the reality of continued combination of functions in one person, we feel compelled to offer a more clear direction. Recently in *Garcia v. Wibholm*, 461 N.W.2d 166 (Iowa 1990), the supreme court discussed the role of the guardian ad litem in supplying a defense for an indigent incarcerated civil defendant. Looking to *Stephens v. Wood*, 196 Iowa 1394, 1397–98, 195 N.W. 239, 241 (1923), the court stated: "Simply put, the guardian ad litem must do whatever the circumstances of the particular case dictate is necessary to protect the ward's interest." *Garcia*, at 170. For better or worse, whether a guardian ad litem does all the things required under the circumstances in representing children is a question which, peculiarly, is answerable only by the guardian ad litem.

An attorney serving as a guardian ad litem in CINA or termination proceedings is subject to a high standard of conduct. We think "whatever the circumstances of the particular case dictate" should include a uniformly high standard of conduct in CINA and termination proceedings. Investigation has to be the cornerstone of the guardian ad litem's representation of a child's best interest. It should go without saying that first hand knowledge of the parties and the circumstances is, at minimum, helpful and, in the closer cases, necessary. When an attorney serves as guardian ad litem, it is a direct violation of the code of responsibility to undertake representation of anyone or to proceed in legal matters without being properly informed both as to matters of law and fact:

DR 6–101 Failing to Act Competently.
(A) A lawyer shall not:
(1) Handle a legal matter which he knows or should know that he is not competent to handle....
(2) Handle a legal matter without preparation adequate in the circumstances.
(3) Neglect a legal matter entrusted to him.

Similar sentiments are expressed in EC 6–1 (stating "lawyer should act with competence and proper care"), EC 6–4 (requiring "proper care to safeguard" client interests and must "prepare adequately for and give appropriate attention to his legal work"), and EC 6–5 (calling for pride in "professional endeavors"). These are appropriate goals for lawyer and non-lawyer alike, but they are binding on the bar. *See also* Model Rules of Professional Conduct rule 1.1 (requiring "competent representation," including "legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation").

Finally, we point out that our system has provided us with advocates and an impartial decision-maker. The guardian ad litem is not designed to be the decision-maker, and is an advocate for the child, not the parents or the State. It simply is not sufficient for a guardian ad litem to sit back, review the record and the arguments, and arrive at a decision. This function is filled ably by the juvenile courts. Neither is it sufficient for a guardian ad litem to be a handmaiden to one of the adversary parties. Usually there will be a limited number of options for which to advocate, such as whether or not to terminate the parent-child relationship, and the guardian ad litem will often have a position consistent with one of the adverse parties· and ·in opposition to another. This, however, must be solely as an advocate for the interests of the children. Otherwise, the guardian ad litem is merely perfunctory, serving only to fulfill arcane, if not empty, requirements of due process.

## VII.

Having carefully reviewed the record, we conclude there is clear and convincing evidence to show that the children cannot be returned to either parent. We hold that the parent-child relationship between natural mother L.W. and her children J.V. and C.W. Jr. and between natural father C.W. Sr. and his son C.W. Jr. should be terminated.

AFFIRMED.