In the Interest of B.H. and
R.H., Minor Children.

J.H., Father, Appellant.

No. 93–1358.

Court of Appeals of Iowa.

March 24, 1994.

Craig N. Mershon and Mark E. Mershon of Mershon, Snow & Knock, Cedar Falls, for appellant.

Bonnie J. Campbell, Atty. Gen., John M. Parmeter, Sp. Asst. Atty. Gen., Kathrine S. Miller–Todd, Asst. Atty. Gen., and Stephen J. Halbach, Asst. County Atty., for appellee.

Heard by OXBERGER, C.J., SACKETT, J., and CRITELLI, S.J.*, but decided by DONIELSON, C.J., HAYDEN, SACKETT, HABHAB, CADY, and HUITINK, JJ.

* Senior judge from the 5th Judicial District serving on this court by order of the Iowa Supreme Court.

1. The rights of the mother's birth parents were terminated in about 1975. In 1976, she was adopted. However; in 1982, she was placed under the care of human services in North Dakota and again placed in foster care because she was physically and sexually abused by her adoptive mother and father. She stayed in foster care until she was eighteen.

SACKETT, Judge.

The question in this appeal is whether we should affirm the juvenile court's August 6, 1993, decision terminating the father's parental rights to Blake, born on July 25, 1985, and Randy, born on March 8, 1987. The father contends it is in the children's best interest his rights not be terminated and the case should be remanded to the juvenile court to take further evidence. The State disagrees, contending the best interests of the children require affirmance.

Randy and Blake first came to the attention of the authorities when their mother, Karen, in late March 1987, failed to adequately supervise them. Jim, this appellant, was incarcerated at Mt. Pleasant, Iowa. On July 27, 1987, Randy and Blake were found to be children in need of assistance. There were a number of services offered to Karen, including a parent connection volunteer, homemaker services and monitoring, and counseling. Karen, born in 1964, was determined to have special needs herself.[1]

Karen, during the termination hearing, voluntarily relinquished her parental rights and is not a party to this appeal. Jim, incarcerated at the time of the termination hearing, objected to termination of his rights.

Jim was living with Karen when Blake was born in 1985. Jim was taken into custody on November 22, 1985, for an offense of burglary in the second degree. In January 1987, Jim was sentenced to prison. Randy was born in March 1987. In October 1987, Jim was released from jail and returned home. Jim began working with the Department of Human Services and was able to successfully stabilize the family in such that court supervision of the family was terminated in June 1989. Within four months, Jim was arrested for assaulting Karen. Jim, by his own admission, said he slapped her around and left a bruise on her neck from grabbing her there. Although Jim was on parole for his

burglary offense, his parole was not revoked based on the domestic abuse that occurred.

In June 1990, Jim was taken into custody for two additional felony offenses. Jim has remained in custody since his arrest. He ultimately was sentenced with a discharge date of 1998. Jim appeared in front of the parole board in December 1992, with a recommendation from his counselor that he be released on parole but the request was denied. He again appeared before the parole board in December 1993.

In October 1991, Jim filed an application for visitation and requested the children be brought to Anamosa, claiming he had made such a request with the department and it had not been granted. The department resisted because the foster parent was single and not able to transport the boys to Anamosa. The court granted visitation but the father's parents never facilitated the visitation.

In its order terminating parental rights, the juvenile court outlined the history of Jim's involvement with the legal system. It found Jim was denied parole in December 1992, was not eligible for parole until December 1993; and, even if then released, would have to stay at a work release center for three months.

The juvenile court found the case demonstrates Jim, when available, can provide some adequate care for the children. The court also found Jim shows little understanding of the children's needs and minimizes their behavior problems and left the care of the children with the mother despite the fact he recognizes her deficiencies.

The juvenile court further found:

Jim's history of self-indulgence and poor judgment argues eloquently that he will continue in his same patterns.

Although his attempts to keep in contact with his children are admirable, those attempts will never substitute for the care and nurturance that these children need now.

The State argues termination of parental rights is in the children's best interest because it is doubtful the father can parent the children, and the children need permanency. The State's brief makes only one reference to the record in support of its argument. On oral argument, the State contended there is urgency because any delay in terminating parental rights makes adoption less likely.

The State's brief makes no effort to address the serious and complex problems this court and the juvenile court and the guardian ad litem [2] faced in attempting to weigh the perplexing issues concerning these children's futures.

The future for these children is not bright whether their parental rights are or are not terminated. The guardian ad litem advanced he did not think the children were adoptable at the time of the termination hearing and made the following recommendation:

These children have been waiting for a long time for a permanent home as has been pointed out today. I don't feel that the petitioner has shown that it would be in the children's best interest, however, to terminate the parental rights with their father. There's been no showing that he's not capable of caring for the children or won't be at some point after his release. The only thing that's barred him from taking a more active role in this case, I think, has been his incarceration and he was incarcerated before the latest child in need of assistance petition was filed.

I'm impressed with the fact that he's done everything he can to keep in contact with these children. I think it remains to be seen at what point or what happens once he is released. These children are going to be, apparently they have a need to be in therapeutic foster homes that they're in to be separated at the present time. I was opposed to that initially and I've talked it over with Ms. Mohling. We both agreed initially to try and keep them together in the same therapeutic foster home. That didn't work out. Apparently at least some great progress is being made

---

2. The guardian ad litem actively advocated for the children at the trial court level but failed to file a brief in the children's behalf in this appeal.

The guardian ad litem is designed to be an advocate for the child. *See In re J.V.*, 464 N.W.2d 887, 893 (Iowa App.1990).

with Randy and some is being made with Blake now.

I don't think these children would be adoptable at this time anyway. I think they need to be where they're at for the time being. I think Mr. Howard needs to get himself out of prison, get himself established, re-establish his relationship with these children. I know it's going to be a lengthy process, but I don't think it's fair to anybody to terminate his parental rights at this time.

Our review of the record reveals there is substantial support for the guardian ad litem's opinion the children are not adoptable.

A foster family specialist from Four Oaks reported as follows:

[T]hat aside from behavioral difficulties that Randy and Blake experience with each other is that Randy's behavior is especially difficult to manage in a foster home. First, he is destructive to property and has already inflicted much damage to the foster home. Additionally, he does not listen to the foster parents, and he wanders at night, which has lead to inadequate rest for the foster parents. One may anticipate that as Randy gets older his ADHD and lower intellectual functioning will make it more difficult to maintain him in a family setting.

The University of Iowa Hospitals and Clinics reported the following about Randy:

Concerns: hyperactivity, impulsivity, poor sense of danger, history of fire setting, fighting with brother, borderline IQ, history of failure to thrive. Discharge diagnoses include attention deficit hyperactivity disorder, oppositional defiant disorder, V code parent-child problem and history of failure to thrive. Current medications are Ritalin and Imipramine. Randy is overactive, impulsive and easily distracted. Attention span is short and he engages in unsafe play due to hyperactivity and impulsivity.

The Black Hawk–Grundy Mental Health Center, Inc. said on June 4, 1992:

At this point, both Randy and Blake present with very significant psychiatric disorder which for now, may significantly reduce the likelihood of their being successful candidates for adoption.... It is possible that their interests would best be served by long-term foster care.

These children have suffered because of their parents' lack of parenting skills. They are a second generation in the foster care system. The children have not substantially improved in the state's care.[3]

We cannot assume termination guarantees adoption.[4] The children's problems significantly reduce their opportunities for adoption. An adoptive parent or parents will take on extremely difficult problems if they adopt these children. Jim, with all his inadequacies, loves his children. He took parenting classes while in prison and wrote to them regularly. There is a rebuttable presumption that the best interest of a child is served when custody is with the natural parents. Iowa Code § 232.1 (1991); *In re S.J.*, 451 N.W.2d 827, 830 (Iowa 1990); *see also Santosky v. Kramer*, 455 U.S. 745, 769–70, 102 S.Ct. 1388, 1402, 71 L.Ed.2d 599, 617 (1982).

This record is filled with papers, reports, and evaluations. Considerable resources have been expended, yet little has been done to improve the children's plight. Will greater strides be made if Jim is legally erased from their lives? There is a strong possibility these children will, with or without termination of their father's parental rights, remain in institutional or foster care until their majority.

Termination is an outcome of last resort. To legally end a relationship with an ineffectual but loving and caring parent, without being reasonably assured of any hope of permanency with an adopted family, is of doubtful advantage to a child. *See S.J.*, 451 N.W.2d at 832.

---

3. One foster home provided was that of an older single woman parenting six children ages seven and younger.

4. In Iowa in 1992, 263 special-needs children were freed for adoption, but only 138 were adopted. Phoebe Wall Howard, *'Special-needs' Kids Pray for New Families, New Lives,* Des Moines Sunday Register, Oct. 10, 1993, at 1A.

Jim is one of the few people who loves these children. Children have a basic need for love and yet love is a word rarely, if ever, mentioned in our termination statutes. In Jim's petition for remand, he relates he is out of prison and will soon be in a position to assist with their care.

We find it would be in the best interest for these children to be a part of a structured and supportive family with the love, expertise, and resources to meet their special needs. We also find no evidence that such a situation is available for these children. The only question we can answer is what of the available alternatives is better for the children.

The current alternatives are (1) terminate Jim's parental rights and continue foster care placement recognizing the children's chances for an adoptive placement are poor, or (2) do not terminate Jim's parental rights and place the children in long-term foster care placement and make efforts to integrate Jim in their lives.

While we review de novo, *see* Iowa R.App.P. 4, we cannot, from this written record, make a clear determination what is actually better for these children. The statutory grounds for termination have been met.

The juvenile court had an opportunity to view the parties and the witnesses. We defer to its judgment.

**AFFIRMED.**

HAYDEN, J., specially concurs.

HAYDEN, Judge (specially concurring)

I concur in the result.