**IN THE COURT OF APPEALS OF IOWA**

No. 22-1816
Filed May 10, 2023

**IN THE INTEREST OF B.B.,**
**Minor Child,**

**A.D., Mother,**
       Appellant.
_____

       Appeal from the Iowa District Court for Polk County, Brent Pattison, District
Associate Judge.

       A mother appeals the termination of her parental rights to her five-year-old
son. **AFFIRMED.**

       Lori M. Holm, Des Moines, for appellant mother.

       Brenna Bird, Attorney General, and Ellen Ramsey-Kacena (until
withdrawal) and Mary A. Triick, Assistant Attorneys General, for appellee State.

       Lynn Vogan, Des Moines, attorney and guardian ad litem for minor child.

       Considered by Tabor, P.J., and Schumacher and Ahlers, JJ.

**SCHUMACHER, Judge.**

A mother appeals the termination of her parental rights. She claims the State did not establish a ground for termination. She also claims termination is not in the child's best interests, and that this court should decline to terminate her rights due to the close bond she shares with the child. We find the State established a ground for termination by clear and convincing evidence. Termination is in the child's best interests. And, like the juvenile court, we decline to apply an exception to preclude termination of the mother's rights. We affirm.

## I.       Background Facts & Proceedings

This is a case about B.B., a five year-old boy who has been under the jurisdiction of the juvenile court for all but seven months of his life. His mother gave birth to B.B. in 2017.[1] She and B.B.'s father ended their relationship about four months later. Allegations of domestic violence and substance abuse brought the family to the attention of the Iowa Department of Human Services.[2] In August 2017, the juvenile court adjudicated B.B. as a child in need of assistance (CINA). That CINA case closed in July 2020 with a bridge order granting sole custody of B.B. to the mother.[3]

---

[1] The mother has another child she placed out of state when the mother was dealing with a heroin addiction. That child is not part of these proceedings.

[2] The department is now known as the Iowa Department of Health and Human Services.

[3] The court placed B.B. in the mother's custody because of the father's alcohol abuse and his minimal contact with B.B. And the mother tested negative for drugs over the course of the first CINA case. In May 2020, the mother married an individual who had a criminal history, including methamphetamine manufacturing. They divorced in April 2022.

But placement of the child with the mother was short-lived. Three months after the closure of the CINA case, West Des Moines police encountered the mother and then three-year-old B.B in a hotel parking lot. The two were in a running car at night with the headlights off. When the mother opened the car door, officers smelled marijuana. Based on that smell, they searched the car and found a glass pipe and marijuana. Officers also searched the mother's purse and found a syringe. The mother was arrested and B.B. was placed outside the mother's home under a safety plan.

After the mother's release from jail the next day, she spoke with the department.[4] The mother agreed to continue the safety plan, with the individual with whom B.B. was placed serving as B.B.'s primary caregiver and supervising the mother's interactions with B.B. The mother also shared her drug history with the department—including a heroin addiction for which she successfully sought treatment in 2016. In later discussions, she agreed to undergo drug screening because of the nature of her arrest.

But the mother failed to follow through with that testing. Days later, she took B.B. from his placement without telling the department. The case worker called many times but could not get in touch with her.[5] The mother evaded the

---

[4] The mother said she and B.B. were staying at the hotel to give the placement a break. She also asserted that the drugs and paraphernalia were not hers and that she did not know that contraband was in the borrowed car. The juvenile court found these assertions lacking in credibility because the mother had been arrested before in the same car and police found the syringe in her purse.

[5] The mother did contact her case worker once in November by email. She told the worker that her phone was broken, that she was sick, and she was self-quarantining. She agreed to reach out once she was feeling better, but never followed through.

department until December 2020 when workers obtained her new address. Once workers confronted the mother at her home, she admitted knowing that the department had been trying to contact her "but [she] was just busy." She again agreed to drug testing and to undergo a substance-abuse evaluation. The mother asked the department to place B.B. with her ex-boyfriend, Bradley.

The mother evaded drug testing again. She did obtain a substance-abuse evaluation but she reported no substance use in the last five years—despite her recent arrest and her guilty plea to a drug possession charge in 2018. On top of that, the department had trouble contacting her or Bradley. As a result, the department sought a temporary removal order.

In January 2021, the court ordered B.B. be removed from the mother's custody. Two months later, the court again adjudicated B.B. as a CINA because of the mother's unaddressed substance abuse and her reluctance to work with the department.[6] The mother again requested B.B. be placed in Bradley's care. But the department placed the child in foster care because Bradley had a criminal history.[7] The court found that the mother needed "to address the combination of substance abuse, mental health, and relationship issues that lead to unsafe situations for [B.B.]" And the court ordered her to comply with the department's directives for drug screens and therapy referrals.

---

[6] The court was also concerned about the mother's relationship with her husband, given his arrest warrant and criminal history. The mother claimed that they were separated by the date of the CINA hearing.

[7] Bradley testified at the termination trial that all of his criminal offenses occurred more than a decade earlier, explaining he had two domestic abuse convictions and a third-degree attempted burglary in 2002 and a methamphetamine charge in 2008.

The department's primary concern revolved around the mother's substance abuse. The mother failed to comply with drug testing throughout these proceedings. When she did participate in testing, she tested positive for methamphetamine, including in tests conducted in April and June 2022. She has only had one drug test come back negative for illegal substances. The mother contends her only use of methamphetamine occurred in July 2022, suggesting the other drugs tests were false positives caused by environmental contamination. The juvenile court did not find that assertion credible.

The mother has failed to engage in substance-abuse treatment to address the department's concerns. She obtained a substance-abuse evaluation in spring 2022 that recommended extensive outpatient therapy, but by June the mother admitted she had not attended recently. She obtained another substance-abuse evaluation in July. She had not yet started treatment by the termination hearing but acknowledged she could have done so.

Despite the mother's failure to meaningfully address her substance-abuse issues, she has made some progress in other aspects of the department's recommendations. Her individual therapist and B.B.'s therapist agreed that the mother consistently attended appointments. She appeared for visits with B.B., and planned fun activities for her and the child. She did not present behavioral indicators of drug use during those visits. The child's therapist, based only on what was observed during therapy, recommended increased visitation from the existing visitation schedule that occurred twice a week and were fully supervised. Her recommendation was qualified though given the mother's continued use of illegal substances.

B.B. has remained in the same foster placement since January 2021. The placement includes two other children. B.B. has grown close to his foster mother and foster brother. Indeed, B.B.'s therapist indicated that losing contact with the family would be "devastating" for B.B. The mother expressed concerns at the termination hearing that B.B.'s behavior had been regressing, including "baby-talk" and being clingy to the mother. That said, B.B.'s therapist indicated in August 2022 that B.B. "has become significantly less aggressive and he is now exhibiting calm and nurturing play on a consistent basis."

The State petitioned to terminate the mother's parental rights in July 2022. Following the termination hearing—during which, for the first time, the mother acknowledged her drug use, albeit only conceding to the use of methamphetamine in July 2022—the court terminated the mother's parental rights pursuant to Iowa Code section 232.116(1)(f) (2022).[8] The mother appeals.

## II.      Standard of Review

We review the termination of parental rights de novo. *In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012). "We give weight to the juvenile court's factual findings, especially when considering the credibility of witnesses, but we are not bound by them." *Id.* (citation omitted). Our overriding consideration is the best interests of the child. Iowa R. App. P. 6.904(3)(o).

## III.     Discussion

The mother claims the State failed to establish a ground for termination under section 232.116(1). She also contends termination is not in B.B.'s best

---

[8] B.B.'s father's parental rights were also terminated. He does not appeal.

interests. And she asks this court to apply an exception to termination based on her close bond with B.B.

## A.      Ground for Termination

The mother asserts the State failed to establish a ground for termination. The court found the State established a ground under section 232.116(1)(f) by clear and convincing evidence.[9]  The mother only contests the last ground, that B.B. cannot be returned to her custody at the present time.  "At the present time" means at the time of the termination hearing.  *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010).

We, like the juvenile court, find clear and convincing evidence B.B. cannot be returned to the mother at the present time.  Despite the mother's efforts at therapy and attending B.B.'s therapy, she has not addressed the concerns that caused B.B.'s removal in the first place: her use of illegal substances.  The mother tested positive for methamphetamine repeatedly, and admitted to using methamphetamine as recently as July.  Given her failure to attend substance-abuse treatment or otherwise meaningfully address her substance abuse, B.B., particularly at his young age, could not safely be returned to her custody at the

---

[9] That ground is met when the court finds all of the following:
    (1) The child is four years of age or older.
    (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
    (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
    (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

present time. *See A.B.*, 815 N.W.2d at 776 ("We have long recognized that an unresolved, severe, and chronic drug addiction can render a parent unfit to raise children.").

### B.      Best Interests of the Child

The mother contests whether termination is in B.B.'s best interests. When examining this issue, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

We find termination is in B.B.'s best interests. The mother has not addressed her drug use, only recently acknowledging it as an issue. The mother has already been granted a six-month extension. "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *In re P.L.* 778 N.W.2d 33, 41 (Iowa 2010). B.B. has been involved in these proceedings for most of his young life—he deserves permanency. And he is integrated into the foster placement, which has indicated a willingness to adopt. Iowa Code § 232.116(2)(b). Termination is in his best interests.

### C.      Close Parent-Child Bond

We begin with noting that although Iowa Code section 232.116(3) contains grounds which a juvenile court may invoke to preclude termination, such statutory grounds are permissive, not mandatory.

> While a finding of any of these factors allows us to choose not to terminate parental rights, "[t]he factors weighing against termination in section 232.116(3) are permissive, not mandatory." *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (quoting *In re D.S.*, 806 N.W.2d 458, 474–75 (Iowa Ct. App. 2011)). We may use our discretion, "based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship." *Id.* (quoting *D.S.*, 806 N.W.2d at 475).

*In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016). In the single page of her briefing devoted to this exception, the mother asserts this court should decline to terminate her parental rights based on her close bond with B.B. *See* Iowa Code § 232.116(3)(c). It is uncontested that the mother and B.B. appear to share a close bond. The juvenile court found:

> There was evidence of a close relationship between [B.B] and his mother. He is sad to leave visits. He looks forward to time with her. And his therapist can see a bond during sessions with [B.B.] and his mother. However, after considering [B.B's] young age, the length of time he has been out of home, his strong relationship with his foster family, his therapist's input, and his need for permanency, the Court finds there are no legal exceptions in Iowa Code Section 232.116(3) which would argue against termination.

We agree with this determination. On this record, any short-term sadness B.B. may experience does not outweigh the disadvantages the child will endure because of the mother's inability to provide for the child's ongoing needs. In a similar case we stated:

> Any sadness the child may experience because of termination does not overcome the likely long-term hardship and neglect the child will suffer if in the care of [the mother] . . . . The court simply cannot find that the parent-child relationship is so strong that it outweighs the need for termination. Despite any fondness or love between the [mother] and the child, it is not in the child's best interest to wait any longer for permanency.

*In re A.W.*, No. 20-0834, 2020 WL 6157823, at *1 (Iowa Ct. App. Oct. 21, 2020). And as highlighted by B.B.'s therapist, although B.B. and his mother share a bond, he is in a placement that is "safe, secure, supportive, and consistent" and separation from the placement would be "devastating." The court's consideration must center on whether the child will be disadvantaged by termination, and "whether the disadvantage overcomes [the parent's] inability to provide for [the child's] developing needs." *See D.W.*, 791 N.W.2d at 709.

By the time of the termination hearing, B.B.'s mother had not even begun substance-abuse treatment, twenty months after B.B.'s second removal from his mother's custody. The same issues plagued the mother as in the first CINA proceeding—her failure to address her substance abuse. Particularly telling is that the mother continued to test positive for methamphetamine. She tested positive in April and June 2022. She failed to participate in a drug screen in August 2022, just a month before the termination hearing, and admitted to a relapse with use of methamphetamine the month before. And as concerning is the mother's dishonesty regarding her use, even at the time of the termination hearing. The case manager noted at the termination hearing that any bond between the mother and the child should not outweigh termination:

> B.B. is a very young child who needs a safe adult to meet his everyday needs, to provide him supervision, a safe home for him, to have his medical, educational needs met. The concern in this case is ongoing methamphetamine use, and if [B.B.] can't be safe with his mom, unfortunately I think that overrides the positive relationship or the bond that [the child's therapist] references in her letter because he can't be safe with a parent that continues to use. He just doesn't have protective capacities to help himself at that age.

The juvenile court addressed the bond at the termination hearing. As partially quoted by the dissent, the juvenile court stated:

> But even so, I mean, like today, on the day of the TPR hearing, after twenty months of the case, you're not in a treatment program, and that worries me, but it's also heartbreaking to see that when I know how much [B.B.] loves you, because I really believe that a hundred percent that you guys do—I'm like [the case manager]. I'm not an expert on bond, but I know when a little boy loves his mom, and I know that's what's going on here.
>     . . .
>     So, I mean, I think there's no question in my mind that [B.B.] loves his parents and his parents love him, but I'm put in a very difficult position by how late in the game we are and I see a lot of missed opportunities; right?

To her credit, the mother recognized during her testimony that what is best for her may not be best for B.B. The application of the urged exception to B.B. likely destines B.B.'s future as one existing without permanency. He is just five years old. B.B. has been in limbo for most of his life. The mother's interactions with B.B. remained supervised for an hour and a half twice a week at the termination hearing. She has not demonstrated that she can safely parent full-time, even with a previously granted extension. B.B. has waited a long time—nearly the entirety of his life—for his mother to be able to do so. He should not have to wait any longer.

> We do not "gamble with the children's future" by asking them to continuously wait for a stable biological parent, particularly at such tender ages. *In re D.W.*, 385 N.W.2d 570, 578 (Iowa 1986) (quoting *In re Kester*, 228 N.W.2d 107, 110 (Iowa 1975)); *see also In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990) ("Children simply cannot wait for responsible parenting. Parenting . . . must be constant, responsible, and reliable.").

*D.W.*, 791 N.W.2d at 707.

On this record, the mother failed to present clear and convincing evidence that the child will be disadvantaged by termination and that any disadvantage overcomes the mother's inability to provide for the child's developing needs.  We agree with the juvenile court's determination that a permissive exception pursuant to Iowa Code section 232.116(3) should not be applied to preclude termination.

**AFFIRMED.**

Ahlers, J., concurs; Tabor, P.J., dissents.

**TABOR, Presiding Judge (dissenting)**

"I'm not an expert on bond, but I know when a little boy loves his mom, and I know that's what's going on here." This insight from the juvenile court is why we need not terminate Allison's parental relationship with B.B. Since the inception of Iowa's modern child welfare law, our legislature has made clear that proof of abuse or neglect is not the end of the analysis in a termination-of-parental-rights case. A court may preserve the family when a parent shows by clear and convincing evidence that termination would be detrimental to the child—at the time—because of the closeness of their bond. *See* Iowa Code § 232.116(3)(c) (2022); § 232.114(6)(c) (1979). Because Allison met that burden, I respectfully dissent.

In deciding termination appeals, we must remember that "the relationship between parent and child is constitutionally protected." *In re M.S.*, 889 N.W.2d 675, 678 (Iowa Ct. App. 2016) (quoting *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978)). "[T]he custody, care and nurture of the child reside first in the parents." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). "But the family itself is not beyond regulation in the public interest." *Id.* Our state "has a duty to assure that every child within its borders receives proper care and treatment, and must intercede when parents fail to provide it." *In re A.M.*, 856 N.W.2d 365, 376 (Iowa 2014). "Iowa Code chapter 232 codifies the balance our legislature has struck between these competing interests." *M.S.*, 889 N.W.2d at 678.

Allison's petition on appeal follows the traditional three-step analysis for termination-of-parental-rights cases. *See In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010). First, in her view, the State did not offer clear and convincing evidence of a ground for termination under Iowa Code section 232.116(1). Second, she

argues termination is not in B.B.'s best interests. And third, she contends that severing her parental rights would harm B.B. because of the closeness of the parent-child relationship. *See* Iowa Code § 232.116(3)(c); *In re A.H.*, 950 N.W.2d 27, 42 (Iowa Ct. App. 2020) (explaining that parents bear the burden to prove that a permissive exception applies to prevent termination).

These three separate arguments require three distinct analyses. And I agree with the majority's resolution of Allison's first two arguments. But I disagree on the third step. Allison offered clear and convincing evidence that termination would harm B.B. because of the closeness of their relationship. *See* Iowa Code § 232.116(3)(c). That close-relationship exception dates back to the adoption of our modern termination law. 1978 Iowa Acts ch. 1088, § 65. Given its primordial nature, we can better understand its effect on today's proceedings by tracing the history and text.

## I.  History and Text of the Close-Relationship Exception

Iowa Code chapter 600A used to be the exclusive method for terminating parental rights. Iowa Code § 600A.3 (1977). It contained seven grounds for termination. *Id.* § 600A.8. But no permissive exceptions comparable to those now in section 232.116(3). After deciding that statutory grounds were met, courts still had to "determine that the termination would benefit the children." *See In re B.L.A.*, 357 N.W.2d 20, 23 (Iowa 1984) (applying section 600A.1 which described the "welfare of the child" as the "paramount consideration in interpreting this

chapter").[10]  Problem was, the statute provided no guidance on what factors to weigh in deciding what was in a child's best interest.

Before the legislature revised our juvenile justice statutes, a leading scholar voiced concerns about existing state standards for terminating parental rights—including Iowa's regime.  Michael S. Wald, *State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights*, 28 Stan. L. Rev. 623, 689 n.261 (1976) [hereinafter Wald] (asserting that "courts have ordered termination in cases where preservation of the family was both possible and warranted" and citing Iowa as example).  To address those concerns, Professor Wald proposed exceptions to bypass termination in certain situations.  Wald, at 706; *see P.L.*, 778 N.W.2d at 36 (referring to Wald's proposals as "the Model Child Placement Code").

Professor Wald identified four situations when an exception to termination should apply.  Wald, at 696.  The first situation was when "[t]ermination would be seriously detrimental to the child due to the strength of the parent-child relationship."  *Id.* at 696.[11]  Wald noted that "some children in foster care retain very strong ties to their natural parents" to the point that "they refuse to accept anyone in place of their own parents."  *Id.* at 696−97.  In his view, "termination in such situations is likely to be harmful to the child."  *Id.* at 697.

---

[10] This section also stated that "the interests of the parents of this child . . . shall be given due consideration in this interpretation."  *Id.* § 600A.1.

[11] The other three situations included (2) children placed with relatives who are willing to provide permanent care but do not wish to adopt; (3) children who need special treatment; and (4) permanent family placement is unavailable or undesirable.  *Id.* at 696–99.

Two years after Professor Wald's article, our legislature adopted a new framework for terminating parental rights for children in need of assistance under Iowa Code chapter 232. 1978 Iowa Acts ch. 1088 §§ 60–67 (codified as amended at Iowa Code § 232.109–.120). This statutory scheme tracked Professor Wald's model child placement code. *P.L.*, 778 N.W.2d at 36. Chapter 232 then contained five grounds for termination. *See* § 232.114(1)–(5) (1979). And courts continued to apply a best-interests analysis. *See In re Dameron*, 306 N.W.2d 743, 747 (Iowa 1981). But the statute also contained five new exceptions. Iowa Code § 232.114(6)(a)–(e). These exceptions also followed Wald's model—including an exception to termination when it would harm the child. *Compare* Wald at 706; *with* § 232.114(6)(c) (1979).

Despite amendments to the statute since its adoption, the language of the close-relationship exception remains true to its original form:

| Model Child Placement Code (1976) | Iowa Code Section 232.114(6)(c) (1979) | Iowa Code Section 232.116(3)(c) (2021) |
|---|---|---|
| [A] court should not order termination if it finds by clear and convincing evidence that any of the following are applicable: (a) Because of the closeness of the parent-child relationship, it would be seriously detrimental to the child to terminate parental rights at this time. | [T]he court need not terminate the relationship between parents and child if the court finds: . . . c. There is clear and convincing evidence that such termination would be detrimental to the child at the time due to the closeness of the parent-child relationship[.] | The court need not terminate the relationship between the parent and child if the court finds any of the following: . . . c. There is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship[.] |

But our legislature did make two key changes to the model language. First, the statute substitutes the phrase "need not" for "should not." Iowa Code § 232.116(3)(c) (2021).[12] Second, the legislature changed "seriously detrimental" to "detrimental."[13] *Id.* These changes offset one another—a lesser burden of harm but permissive application of the exception. This framework supports the statute's aim to balance the State's duty to protect children against the constitutionally protected parent-child relationship. *See M.S.*, 889 N.W.2d at 678.

## II. Application of Exception to B.B. and Allison

With the history and text of the close-relationship exception in mind, I turn to its application here. Allison must show by clear and convincing evidence that the termination of her parental rights would harm B.B. at the time because of their close bond. Iowa Code § 232.116(3)(c). If she makes that showing, *then* we must decide whether the exception should preclude termination. *In re C.A.*, No. 13-1987, 2014 WL 1234470, at *3 (Iowa Ct. App. Mar. 26, 2014) (noting court has discretion to terminate even when parent proves an exception).

---

[12] We've interpreted this language to mean that the exceptions are permissive, not mandatory. *In re J.V.*, 464 N.W.2d 887, 890 (Iowa Ct. App. 1990), *abrogated on other grounds by P.L.*, 778 N.W.2d at 39.

[13] The code does not define "detrimental." The dictionary defines it as "causing damage or harm; injurious." Detrimental, American Heritage Dictionary (2d ed. 1985). And our case law has used harm and detriment interchangeably. *See In re M.W.*, No. 08–0784, 2008 WL 2522001, at *1 (Iowa Ct. App. 2008) ("[T]he juvenile court need not terminate the parental relationship if, based on the closeness of the parent-child bond, termination would be harmful to the child."); *See also In re J.J.*, No. 22-0046, 2022 WL 951030, at *4 (Iowa Ct. App. Mar. 30, 2022); *In re M.C.*, No. 17-1184, 2017 WL 4315079, at *4 (Iowa Ct. App. Sept. 27, 2017).

**A. Did Allison carry her burden?**

Two questions drive the analysis. How close was their bond? And will the child be harmed by severing that bond? In describing situations when termination would be "seriously detrimental" to children, Professor Wald gave examples of children who ran away from their foster care to return home or had to be "moved from foster home to foster home" because they rejected anyone other than their parental figures. Wald, at 696−97. He also focused on children's opinions: "If a child aged 10 or older objects to termination, her objection should be decisive." *Id.* at 697.[14] In his view, even a younger child's wishes "as expressed in interviews with well-trained mental health professionals, should be given great weight in determining whether termination is detrimental." *Id.*

These examples illustrate how the risk of "serious" harm from termination of a close parental bond can manifest in a child. But our statute does not require that the severance be "seriously detrimental" only "detrimental." And our case law recognizes that the risk of losing a close bond, even without outward manifestations of the harm, may meet the burden under section 232.116(3)(c).[15] *See, e.g.*, *M.S.*, 889 N.W.2d at 684 (applying close-relationship exception when father had a "strong bond" with the child, and provided "excellent and loving care

---

[14] Our legislature adopted this example as a separate permissive exception. *See* Iowa Code § 232.116(3)(b) (stating a court need not terminate if "the child is over ten years of age and objects to the termination").

[15] Indeed, as one scholar has observed, "there is no question that when a parent's rights are terminated, it is not only the parent who loses something. The child loses his legal relationship with his parents, extended family members, and potentially his siblings." Brent Pattison, *When Children Object: Amplifying an Older Child's Objection to Termination of Parental Rights*, 49 U. Mich. J.L. Reform 689, 701 (2016).

for the child" during visitation); *In re D.G.*, No. 18-1480, 2019 WL 1294228, at *3 (Iowa Ct. App. Mar. 20, 2019) (reversing termination of mother's parental rights because she "participated in visits and actively engaged with all" of her children); *In re L.C.*, No. 14-2034, 2015 WL 576569, at *5 (Iowa Ct. App. Feb. 11, 2015) (finding that father met burden by being "vigilant in visiting his daughter" and creating a "special attachment" despite not living in same household since she was an infant); *In re J.C.*, No. 11–1936, 2012 WL 469807, at *4 (Iowa Ct. App. Feb. 15, 2012) (finding mother met exception by displaying "extraordinary potential to be a successful parent" in visitation with her son and the two possessed an "unusually close relationship").

Granted, our supreme court has said that the mere "existence of a bond is not enough" to stave off termination. *See In re A.B.*, 956 N.W.2d 162, 169 (Iowa 2021); *see also In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (declining to apply close-relationship exception when mother had "*some* bond" with her two- and three-year-old children, but their visits had not progressed and had become "overwhelming" for the mother).

But here, as the majority concedes, the closeness of the parent-child relationship is "uncontested." To the person, everyone involved recognized B.B.'s tight bond with Allison. The department's social work supervisor testified to that fact. The Court Appointed Special Advocate (CASA) report reflected Allison's keen attention to B.B.'s emotional well-being.[16] B.B.'s therapist also described the "warm and reciprocal relationship" she observed between mother and son: "Allison

---

[16] At the end of the trial, the CASA volunteer told the court "I'm just as conflicted as everybody else with mom and [B.B.] being so bonded. It's a tough one."

has exhibited attuned, nurturing, and responsive behavior with [B.B.]." B.B. repeatedly expressed to his foster mother that he "misses his mom" between visits. Both Allison and her friend Bradley testified to the closeness of the mother-son connection. And the juvenile court commented on the loving relationship between B.B. and Allison.

So the fighting question is: did Allison prove termination would harm B.B. because of their undeniably close relationship? As the juvenile court noted, B.B. is "sad to leave visits" and "looks forward to time" with his mother. But the majority downplays "any short-term sadness that B.B. may experience" as less weighty than the "likely long-term hardship" B.B. would suffer because of Allison's inability to meet his needs.

I disagree with the majority's finding for both legal and factual reasons. Legal first. The majority overlooks the phrase "at the time" in the provision. *See* Iowa Code § 232.116(3)(c). We must assess whether termination would be detrimental to the child "at the time" of the hearing. *Cf. In re L.M.*, 904 N.W.2d 835, 839 (Iowa 2017) (interpreting "at the present time" in section 232.116(1)(h)(4) as the time of the termination hearing). True, the best-interests test in section 232.116(2) mentions the "long-term" nurturing and growth of the child. But that best-interests test is distinct. As *P.L.* explained, after deciding that termination is in the child's best interests under section 232.116(2), the court *still* must consider if any exceptions in section 232.116(3) "allow the court not to terminate." 778 N.W.2d at 39. "As a general rule of statutory construction, we avoid an interpretation or application of a statute that renders other portions of the statute superfluous or meaningless." *Little v. Davis*, 974 N.W.2d 70, 75 (Iowa 2022). So

even though the State proved termination was in B.B.'s best interests, we must separately decide whether Allison proved that termination would be detrimental to B.B. at the time of the hearing.

Which brings me to the factual weakness in the majority's analysis. The record does not support the idea that B.B. will experience only "short-term sadness" from losing his relationship with Allison. Both Allison and B.B. foster mother noticed that his behavioral progress ebbed when the department cut back his mother's visitation because of her positive drug test. The foster mother said B.B. talked more about "his mom" and began to exhibit the same troubling behaviors as when he was first placed in her care. These behaviors worsened to the point where she considered increasing his therapy. Allison also noticed this regression during visits, testifying that the five-year-old grew less confident and acted more like a toddler needing comfort.

Nothing in the record suggests that B.B.'s trauma was transient. For parents, we have accepted the logic that their past conduct conveys their future care-giving abilities. *See In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012). So why would we downplay B.B.'s present distress when deciding whether termination would be detrimental? B.B.'s regression when afforded less time with his mother is strong evidence that he will be harmed by losing that close bond.

Another aspect of Allison's clear-and-convincing proof was B.B.'s objection to termination, as expressed to his GAL.[17] Even at his young age, his wishes

---

[17] Because he was only five years old, the GAL did not believe that B.B. needed a separate attorney, but the GAL noted that she considered his wishes in expressing what she believed was in his best interests.

signal the likelihood that he will suffer harm from the termination. *See* Wald, at 697. Finally, B.B.'s therapist confirmed that "terminating the mother's rights would be a difficult loss" for him.

But in rejecting the close-relationship exception, the majority lifts up other testimony from B.B.'s therapist that his foster home is safe and supportive, and her view that separation from that placement would be "devastating" to him. But unlike section 232.116(2)(b), the close-relationship exception does not mention the child's integration into a foster home.[18] And we are "not free to take children from parents simply by deciding another home offers more advantages." *In re Burney*, 259 N.W.2d 322, 324 (Iowa 1977).

In sum, the closeness of the parent-child relationship is without dispute. And the present detriment from terminating that relationship is evident from B.B.'s behavior. All told, Allison's evidence leaves "no serious or substantial doubt" that her son would be harmed by the termination. *See M.S.*, 889 N.W.2d at 679.

**B. Should this permissive exception preserve their bond?**

Finding Allison has met her burden, the next question is whether this permissive exception should preclude termination. *See J.V.*, 464 N.W.2d at 890. Courts exercise their discretion based on "the unique circumstances of each case and the best interests of the child." *M.W.*, 876 N.W.2d at 225 (citations omitted). In the context of the close-relationship exception, we have described this step as

---

[18] I agree with the majority that B.B. has a strong relationship with his foster family. But despite his integration into their home, he still looks to Allison as his main parental figure. *Cf.* Wald, at 696−97 (citing example of child rejecting other parental figures as sign that termination will be seriously detrimental).

deciding "whether termination achieves justice." *M.S.*, 889 N.W.2d at 684. For B.B. and Allison, it doesn't.

The juvenile court chose not to use this permissive exception to save the parent-child relationship because of B.B.'s "young age, the length of time he has been out of home, his strong relationship with his foster family, his therapist's input, and his need for permanency." As its bottom line, the court found termination was "in the child's best interests." The majority takes a similar path.

They are not wrong about B.B.'s best interests—at least under the framework in section 232.116(2). But the permissive aspect of section 232.116(3)(c) cannot mean wholesale importation of section 232.116(2)'s best-interest structure as the basis for rejecting the permissive exception. Otherwise, *P.L.*'s three-step test is always a two-step test.

What's important when deciding whether the permissive exception should save the parent-child relationship is the "unique circumstances" of the case and how those affect the welfare of the child. As the juvenile court said at trial, this case has unique factors. For example, in most cases "where parents are in the throes" of methamphetamine use, "they're not showing up to their kids' therapy sessions." But Allison did. And Allison went above and beyond to provide special experiences for B.B. during their visitation. She made him pancakes in the shape of the letter B, saved cardboard boxes to paint as a craft project, and decorated his bedroom and his birthday cake with Sonic the Hedgehog—his favorite cartoon character.

The close-relationship exception should preclude termination when a parent shows "extraordinary potential" to be successful and maintains a close bond with

their child. *See, e.g.*, *J.C.*, 2012 WL 469807, at *3−4 (declining to termination when mother had "exemplary interactions" with her eight-year-old son and "did everything she could to keep the visits positive"). In *J.C.*, the mother was also pursuing further education, lived in a safe home, and was developing a healthy support system. *Id.* Based on those circumstances, we preserved the parent-child relationship despite the mother's failure to "embrace her drug-free lifestyle until the eleventh hour." *Id.*

Allison displays that potential in spades. She relishes visits with B.B. and stayed engaged even after the State filed its termination petition. The service providers note her positive parenting skills. In fact, B.B's therapist recommended expanded visitation. Allison also earned an income through odd jobs, such as cleaning houses and baking cupcakes to sell to restaurants. And she enrolled in business classes at Des Moines Area Community College with entrepreneurial aspirations. She has stable housing and a support system in her friend Bradley. She also attends her own mental-health therapy on top of B.B.'s sessions. Her therapist drafted a letter noting her success in their treatment goals:

> [Allison] continues to demonstrate the ability to use coping skills on a regular basis, demonstrates increased levels of self-awareness, is able to receive feedback, has displayed an increased understanding of what her child's needs are, and how to better meet those needs. [Allison] is able to take accountability for her decisions.

True, Allison's acknowledgment of her drug problem came late in the case. But we've applied the close-relationship exception to parents with extraordinary potential even when their efforts to address addiction came "at the eleventh hour."

*See L.C.*, 2015 WL 576569, at *5. Allison's "level of competency as a mother stands out as a rare commodity in our parental termination jurisprudence" and merits protection today. *See J.C.*, 2012 WL 469807, at *3.

Still, the majority laments Allison's "inability to provide for the child's ongoing needs" because of her substance abuse. I can't fault the majority or the juvenile court for their concerns that Allison tested positive for methamphetamine. But Allison's need to address her addiction does not mean we should discard the parent-child relationship. Recall that the juvenile court declined to terminate under section 232.116(1)(*l*), finding no evidence of current peril from her drug use beyond the "general danger presented by parenting with unresolved substance abuse." Indeed, nothing in this record shows Allison's substance abuse affected her interactions with B.B. *See In re A.B.*, 957 N.W.2d 280, 297–98 (Iowa 2021) (reversing termination of mother's rights when there was no sign that her cocaine, marijuana, and alcohol use "interfered with her ability to parent safely"); *M.S.*, 889 N.W.2d at 682 (noting that termination based on substance abuse requires nexus between that abuse and adjudicatory harm). Neither service providers, nor B.B.'s therapist, nor her friend Bradley ever saw Allison under the influence while interacting with her son several times a week. That's not to say I take lightly Allison's avoidance of drug screens or her positive tests just before the termination hearing. But her status as a methamphetamine addict—standing alone—does not mean that she cannot parent B.B. *Cf. In re J.S.*, 846 N.W.2d 36, 42 (Iowa 2014) (analyzing methamphetamine addiction as grounds for CINA adjudication and holding addiction on its own did not mean children were in imminent likelihood of abuse or neglect).

Given these unique circumstances, I would find that severing the strong bond between B.B. and Allison "fails to achieve justice." *See M.S.*, 889 N.W.2d at 686. The legislature enacted the close-relationship exception for a reason. *L.C.*, 2015 WL 576569, at *5. This built-in safety valve allows courts to exercise discretion to preserve a strong parent-child bond when severing it would harm the child. I would reverse the termination order and remand for further proceedings.[19]

---

[19] Finally, saving the relationship under section 232.116(3)(c) is not binding on future termination proceedings where the circumstances, including the closeness of the relationship and the potential harm, will be reassessed. *See In re D.G.*, No. 20-0587, 2020 WL 4499773, *5 (Iowa Ct. App. Aug. 5, 2020) (terminating parental rights because the parents' relationships with their children had "diminished" to where the "bonds are not what they once were").